THE HOOVER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2697–77, 9646–77.     Filed April 24, 1979.

---

*Charles J. Kerester* and *Wallace M. Wright,* for the petitioner.
*Robert A. Roberts, John R. Dorocak,* and *Raymond W. McKee,*
for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent determined the following deficiencies in petitioner's Federal income taxes:

| *TYE Dec. 31—* | *Deficiency* |
|---|---|
| 1968 | $192,775.71 |
| 1969 | 101,508.22 |
| 1970 | 60,005.53 |

The primary issue presented for our decision is whether gains and losses from short sales in foreign currency engaged in by petitioner to offset (1) a potential decline in the value of its investment in certain foreign subsidiaries, whose home currencies may be or are devalued relative to the U.S. dollar, and (2) exchange losses required to be reported on petitioner's consolidated financial statement, constitute ordinary losses or business expenses, and gains, or capital losses and gains. If the gains and losses are capital in nature, we must also determine whether they are short-term or long-term gains and losses.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Hoover Co. (hereinafter referred to as petitioner) is a Delaware corporation with its principal place of business in North

Canton, Ohio. Petitioner filed United States corporate income tax returns for the years in issue with the Internal Revenue Service Center, Cincinnati, Ohio.

Petitioner is, and has for many years been, a publicly held corporation. Its shares, which are traded over the counter, were held by more than 9,000 stockholders as of June 30, 1977. Directly, and through subsidiaries in foreign countries, during the taxable years in question, petitioner was engaged in the business of manufacturing and distributing electric vacuum cleaners and accessories, floor polishers, laundry equipment, automatic washers and dryers, as well as smaller appliances such as irons, toasters, and heaters, and certain other products such as die castings.

Petitioner maintained its books and records and filed its returns for the years in issue on the accrual method of accounting.

In the taxable years 1968, 1969, and 1970, petitioner owned approximately 55 percent of the outstanding shares of Hoover Ltd., a British corporation. The balance of the shares of Hoover Ltd., was publicly held, mostly in the United Kingdom. In such taxable years, Hoover Ltd., had wholly owned subsidiaries in Australia, Austria, Denmark, Finland, Norway, Sweden, and South Africa. Petitioner also owned a 50-percent interest directly, and an additional 27.5-percent interest indirectly (an aggregate of 77.5-percent) in Hoover (Holland) N.V., a Dutch corporation. The latter in turn had active, wholly owned subsidiaries in Belgium, France, Germany, Holland, Italy, and Switzerland. In addition, petitioner had wholly owned subsidiaries in Canada and Panama. The Panamanian corporation in turn owned subsidiaries in Panama, Colombia, Brazil, and Mexico. Petitioner directly or indirectly exercised a majority of the voting power of, and thus controlled, all of the subsidiaries.

The corporate structure denominated above can be graphically shown as on p. 209.

Petitioner did not actively export its finished products to Hoover Ltd., or its other subsidiaries in Europe. Rather, petitioner sold its products primarily in the United States, Canada, and the Caribbean. Hoover Ltd., was the major source of supply to the subsidiaries in Europe and South Africa. Hoover Ltd., manufactured finished products in three plants in the United Kingdom and shipped 40 percent of this production to

HOOVER COMPANIES[1]
(1968)

BRITISH PUBLIC

45% / 55%

Hoover Ltd.
United Kingdom

100%

Australia
Austria
Denmark
Finland
Norway
South Africa
Northern Branch
Sweden

The Hoover Co.
U.S.

77.5%

Hoover N.V.
Holland

100%

Belgium
France
Germany
Italy
Netherlands
Switzerland (2)

100%

Canada

Hoover Inc.
(Panama)

100%

Panama
Colombia
Brazil

[1] To avoid undue complexity, the chart does not include Hoover Worldwide Corp., a U.S. corporation. In 1969–70, Hoover Worldwide was owned by the Hoover Co. (40%), Hoover Ltd. (40%), the Swiss subsidiaries of Hoover N.V. (8%), Canada (6%), and Hoover Inc. (Panama) (6%).

other Hoover subsidiaries. The subsidiaries on the European continent and in South Africa did not actively engage in manufacture, but were essentially sales corporations.

Over the years, petitioner has received dividends from some of its foreign subsidiaries. In addition, it also receives under so-called "Pro-Rata Agreements" payments from certain subsidiaries for "benefits derived" by the subsidiaries from petitioner's research and development activities. Finally, petitioner receives "other foreign income," consisting of interest from some of its foreign subsidiaries, and royalties and management fees from its wholly owned subsidiary in Canada.

The following table sets forth for the years 1963 through 1970 the dividends, pro rata payments, and "other foreign income" received by petitioner from its foreign subsidiaries:

| Year | Dividends | Pro rata payments[1] | Other foreign income[2] | Total |
|------|-----------|----------------------|-------------------------|-------|
| 1963 | $3,385,841 | $1,158,842 | $52,650 | $4,597,333 |
| 1964 | 3,328,585 | 1,312,377 | 55,404 | 4,696,366 |
| 1965 | 3,291,620 | 1,331,014 | 120,462 | 4,743,096 |
| 1966 | 2,814,287 | 1,418,396 | 116,993 | 4,349,676 |
| 1967 | 2,993,891 | 1,576,356 | 542,314 | 5,112,561 |
| 1968 | 2,918,582 | 1,744,802 | 518,774 | 5,182,158 |
| 1969 | 3,615,446 | 1,886,306 | 416,049 | 5,917,801 |
| 1970 | 3,499,908 | 2,090,475 | 333,437 | 5,923,820 |

[1]The "Pro Rata Agreements" require that the foreign affiliates make the applicable payments to Hoover in U.S. dollars.

[2]For years 1963 through 1966, sums shown consist entirely of interest payments. Under the loan agreements, the interest is computed on U.S. dollars loaned, and such interest is payable in U.S. dollars. After 1966, "other foreign income" includes royalties and management fees from Hoover's wholly owned Canadian subsidiary. Such royalties and management fees are computed as a percent of the sales of the Canadian subsidiary and although payable to Hoover in U.S. dollars, are based upon the rate of exchange on the date of payment. During the years 1967 through 1970, the royalties and management fees paid to Hoover by the Canadian subsidiary totaled $501,646, $480,552, $383,938, and $311,293, respectively.

The income received by petitioner as shown in the preceding schedule was received from its subsidiaries during the years 1967 through 1970 as follows:

|  | Dividends | Pro rata payments | Other income |
|---|---|---|---|
| *1967* | | | |
| United Kingdom .......... | $2,465,344 | $1,489,449 | --- |
| Canada ...................... | 115,880 | --- | $501,646 |
| Switzerland ................ | 68,646 | --- | 7,418 |
| Holland ...................... | 344,021 | --- | --- |
| Brazil ........................ | | | 12,820 |
| Panama ...................... | | | 20,430 |
| Latin America ............... | | 86,907 | --- |
| Total ..................... | 2,993,891 | 1,576,356 | 542,314 |
| *1968* | | | |
| United Kingdom .......... | 2,623,614 | 1,664,796 | --- |
| Holland ...................... | 225,218 | --- | --- |
| Switzerland ................ | 69,750 | --- | --- |
| Brazil ........................ | | | 18,005 |
| Panama ...................... | | | 20,217 |
| Canada ...................... | | | 480,552 |
| Latin America ............... | | 80,006 | --- |
| Total ..................... | 2,918,582 | 1,744,802 | 518,774 |
| *1969* | | | |
| United Kingdom .......... | 3,216,680 | 1,794,567 | --- |
| Holland ...................... | 329,226 | --- | --- |
| Switzerland ................ | 69,540 | --- | --- |
| Brazil ........................ | | | 6,242 |
| Panama ...................... | | | 25,869 |
| Canada ...................... | | | 383,938 |
| Latin America ............... | | 91,739 | --- |
| Total ..................... | 3,615,446 | 1,886,306 | 416,049 |

| | *1970* | | |
|---|---|---|---|
| United Kingdom ......... | $3,249,361 | $2,014,651 | --- |
| Holland ...................... | 180,917 | --- | --- |
| Switzerland ................ | 69,630 | --- | --- |
| Brazil ................................................................... | | | $59,844 |
| Panama ................................................................ | | | 15,636 |
| Canada ................................................................. | | | 257,957 |
| Latin America ............................... | | 75,824 | --- |
| Total ..................... | 3,499,908 | 2,090,475 | 333,437 |

During the years 1968 through 1970, petitioner sold components and finished products to certain of its foreign subsidiaries. All such sales were invoiced to those subsidiaries in U.S. dollars and all payments by such affiliates were made in U.S. dollars. The following schedule reflects petitioner's total sales to its subsidiaries for each of the years 1967 through 1970:

SALES TO FOREIGN AFFILIATES

1967–1970

| *Year* | *Total sales* |
|---|---|
| 1967 ............................................. | $2,945,692 |
| 1968 ............................................. | 1,734,995 |
| 1969 ............................................. | 2,158,394 |
| 1970 ............................................. | 1,839,619 |

During the years 1968 through 1970, petitioner purchased components and finished products from some of its foreign subsidiaries. Except for purchases from Hoover Ltd., the subsidiaries generally invoiced petitioner for such purchases in their respective foreign currencies and petitioner's payments were, therefore, made to those subsidiaries in such foreign currencies. With respect to the purchases from Hoover Ltd., petitioner was invoiced in U.S. dollars and payments on such invoices were made in U.S. dollars.

The following schedule reflects petitioner's purchases from foreign subsidiaries during the years 1968 through 1970:

PURCHASES FROM FOREIGN AFFILIATES

1968–1970

| Foreign affiliate | 1968 | 1969 | 1970 |
|---|---|---|---|
| The Hoover Co., Ltd. (Canada) | $13,634 | $25,438 | $25,943 |
| Hoover Ltd. (England) | 1,760,834 | 2,126,230 | 2,524,838 |
| S.A. Hoover (France) | 71,795 | 1,124 | 508 |
| Hoover Mexicana S.A. | 356 | | |
| Total | 1,846,619 | 2,152,792 | 2,551,289 |

In addition to its interests in the operating subsidiaries, petitioner is the 100-percent owner of Hoover Worldwide Corp. (Worldwide). Worldwide was and is engaged in advisory, consultation, and planning services for all of the companies in the Hoover group. With respect to the financial concerns of petitioner, Worldwide's financial and economic specialists were charged with the management of petitioner's cash position, foreign exchange, acquisitions, and pension plan investments. Worldwide's responsibility for foreign exchange included responsibility for petitioner's foreign investments, for its companies abroad, for the assets representing those foreign investments, as well as careful and prudent cash management. Of necessity, Worldwide was concerned with the valuation of currencies and the effect on petitioner of devaluation of foreign currencies.

Prior to November 1967, petitioner engaged in foreign exchange activity described as "leads" and "lags" in the payment and receipt of intercompany payments. A "lead" is an acceleration of payment. For example, if Italian currency were very weak, one did not want to have unnecessary cash assets in Italy; thus, payments due in Italian currency would be accelerated. On the other hand, a "lag" is a delay in payment. For example, if the British pound sterling were in a weakened position, and if the German subsidiary owed money in pounds, it would be advisable to delay the payment as long as possible so as to take advantage of any upward revaluation of the German currency against the pound.

Apart from leads and lags, persons engaged in foreign export or import activities have long found it prudent to fix, in terms of their own currency, the amount they are going to receive or that they will be required to pay, so as to eliminate uncertainty and minimize risk. If one were buying products from the United Kingdom for which he had to pay pounds sterling, and he in turn

were committed to sell them to an American company for dollars, prudence required that he cover his costs in the same currency in which he expected to receive his revenues. This was done by buying a forward contract under which he committed U.S. dollars to the purchase of pounds sterling for delivery on or about the date on which he was obligated to pay, in pounds sterling, for the products. No evidence has been presented to determine whether petitioner ever engaged in such forward contracts to fix the amount, in U.S. dollars, owed or received on the basis of imports or exports. With respect to intercompany sales, petitioner's exports to its subsidiaries were payable in U.S. dollars. Petitioner's imports from its subsidiaries were primarily from Hoover Ltd., and such payments were made in U.S. dollars thereby negating the exchange risk described above.

Although little reason existed for petitioner to "hedge" its position with respect to foreign currency payments on intercompany sales, petitioner was initially concerned with the effect of currency devaluations on dividends received from its foreign subsidiaries. If petitioner had a dividend coming it could do one of two things. It could wait until the day the dividend was paid, and convert it into dollars at the exchange rate in effect at that time. Alternatively, if petitioner was concerned about adverse changes in the exchange rate in the interim, it could sell forward (for future delivery) the amount of foreign currency it expected to receive as a dividend. The forward sale, for which petitioner would receive U.S. dollars, removed the risk of a devaluation of the foreign currency as to this item. For example, if petitioner had made a forward sale with respect to a dividend to be received from Hoover Ltd., it would instruct Hoover Ltd., to pay the dividend to a specified bank for delivery to New York for credit to the account of petitioner to cover the forward sale. If no forward sale of the dividend had been made, the dividend paid in foreign currency would nevertheless be converted to U.S. dollars on the same day that it was deposited in the bank specified by petitioner.

In 1967, an interim dividend from Hoover Ltd., payable in British pounds sterling (£) on September 6, 1967, was expected. Petitioner became worried in early 1967 that a devaluation of the pound might occur before the September dividend was paid. A forward sale agreement was entered into by petitioner on March 16, 1967, with Manufacturers Hanover Trust Co. under

which the latter agreed to purchase £300,000 from petitioner for delivery on September 6, 1967. Hoover Ltd., was then instructed to make the September dividend payment directly to such bank, thus meeting petitioner's obligation to the bank.

No devaluation of the British pound occurred in the period prior to the payment of the September 6, 1967, dividend, but petitioner's concern over the possibility of a devaluation of the British pound continued. This concern was not, however, directed at the effect of a currency devaluation on dividend payments from its foreign subsidiaries; rather, petitioner was concerned with its "net exposure" in its foreign subsidiaries and the effect of a devaluation on such "net exposure." Although petitioner was aware of other companies "hedging" against such "net exposure," petitioner decided not to engage in such "hedging" transactions for the balance of 1967 as it did not believe devaluation of the pound sterling was imminent.

On November 18, 1967, the British pound sterling was devalued 14 percent. In terms of U.S. dollars, the value of £1 fell from $2.80 to $2.40.

For the year ending December 31, 1967, petitioner published consolidated financial statements that included its foreign subsidiaries. Petitioner's investment in these foreign subsidiaries is required to be shown, under proper accounting practices, in terms of assets and liabilities of the subsidiaries as expressed in U.S. dollars. In valuing certain assets and liabilities of the subsidiary, petitioner had to use the current rate of exhange in effect on December 31, 1967. Because of the devaluation in pounds sterling,[1] petitioner was required to translate these items at the rate of $2.40 per pound sterling rather than at the $2.80 rate which had been employed previously. This translation produced an exchange loss of $3,650,318[2] that petitioner reported in its consolidated financial statements. In accordance with

---

[1] Part of the extraordinary loss in 1967 was attributable to the devaluation of the Finnish and Danish currencies. This was not a substantial element of the loss because the companies involved were small. The bulk of the exchange loss was attributable to the devaluation of the British currency.

[2] Estimated net losses for financial report purposes resulting from the 1967 devaluation of British, Finnish, and Dutch currencies, less applicable income taxes, amounted to $6,891,408 (of which $3,241,090 was applicable to minority interest in subsidiaries), and was reported as an extraordinary item in the accompanying financial statements. The extraordinary net losses resulting from the devaluation of foreign currencies, less applicable income taxes, applicable to petitioner, were $3,650,318. The income before the extraordinary item as shown there was $13,816,575. The net income subtracting the extraordinary item of $3,650,318, as reported there, was $10,166,257, a decrease of approximately 26 percent.

generally accepted accounting principles, petitioner treated the exchange loss as an extraordinary charge against its consolidated earnings. Thus, petitioner's earnings per share of common stock, which prior to the extraordinary charge was $2.09, was $1.54 after such charge was subtracted from petitioner's consolidated earnings.

Although the currency devaluation adversely affected petitioner's net earnings for financial purposes, it did not result in a recognized or realized loss for Federal tax purposes. Petitioner believed, however, that the extraordinary charge against its consolidated earnings would result in an adverse economic image for petitioner, both in terms of its reputation with potential and existing investors and in its inability to accurately predict its consolidated earnings because of the uncertainties associated with foreign exchange. Most importantly, petitioner believed that the value of its stock investment in the subsidiaries affected by their country's devaluation was reduced. Finally, currency devaluations might affect the amount and value of subsequent dividend income from the subsidiaries.

In light of the 1967 exchange loss for financial reporting purposes and the perceived consequences of reduced value to its stock investment in certain subsidiaries, as well as the negative financial image to petitioner itself, serious consideration was given to various means of protection against possible devaluation in those currencies of countries in which its subsidiaries were located and doing business. As a result, petitioner decided that it would actively engage in forward sale transactions in an effort to offset potential exchange losses from devaluation of currencies in countries in which its subsidiaries operated. The transactions were not geared to expected dividend payments, and they were not made in reference to intercompany or intracompany sales, account receivables, or payables. Rather, the forward sale contracts were geared to the "net exposure" petitioner had in those subsidiaries.

Prior to making any forward sale of a foreign currency, petitioner measured its exposure to foreign exchange risk. It did that by calculating the net value of the particular foreign subsidiary. First, it calculated the total assets of that subsidiary minus its liabilities in the same currency. Next, the fixed assets of the subsidiary were subtracted because they were translated into U.S. dollars at the historical exchange rate and, therefore,

not considered to be subject to impact by devaluation or revaluation. The calculation also took into account liabilities payable by that company in other currencies. Finally, the net assets exposed to risk were multiplied by the fraction which represented petitioner's ownership interest in the subsidiary.

The mechanics of that process are illustrated by the calculations reflected in schedules attached to a memorandum dated October 31, 1969, from Mr. J. M. Golden to Mr. M. R. Rawson, then the chief financial officer of petitioner, and currently the chairman of the board of petitioner. One of the schedules attached to Mr. Golden's memorandum is set forth below to illustrate the method petitioner used in calculating its net exposure.

### FORWARD CONTRACTS—FOREIGN CURRENCY STERLING

*Hoover Ltd.*                12/31/68

| | | | |
|---|---|---|---|
| Total assets | | $110,611,288 | |
| Less: | | | |
|   Fixed assets | $18,657,864 | | |
|   Investments in affiliates | 12,243,334 | | |
|   Receivables—affiliates | 13,436,026 | | |
|   Liabilities | 31,803,264 | 76,140,488 | |
| Net assets subject to risk | | 34,470,800 | |
| Our interest at 55.29% | | 19,058,905 | |
| Sterling equivalent | | | £7,950,000 |
| | | | |
| Forward contracts due: | | | |
|   1/6/70 | | £2,000,000 | |
|   1/16/70 | | 1,500,000 | |
|   1/20/70 | | 750,000 | |
|   1/22/70 | | 1,000,000 | |
|   1/23/70 | | 1,000,000 | |
|   1/30/70 | | 1,000,000 | |
| Total sterling hedge | | | £7,250,000 |
| Dollar equivalent | | | $17,400,000 |

Percent hedged ....... 91%
Average contract rate ............... $2.3136

*Assumptions*

(1) Contracts closed at rate equivalent
     to today's spot rate (10/30/69) ........ $2.3953
     Average contract rate .................... 2.3136
                                                0.0817

Cost of hedge £7,250,000—@ 0.0817 = $594,325

*Rate per annum* ............................ $\dfrac{592,345}{17,400,000}$ = 3.4%

(2) Contracts closed at softer rate in
     January (assume $2.3836) .............. $2.3836
     Average contract rate .................... 2.3136
                                                0.0700

Cost of hedge £7,250,000—@ 0.0700 = 507,500

*Rate per annum* ............................ $\dfrac{507,500}{17,400,000}$ = 2.9%

Starting in December 1, 1967, and thereafter in 1968, 1969, and 1970, petitioner entered into an aggregate of 18 different forward sale agreements in which it agreed to deliver, at a future date and for a set price in U.S. dollars, a specified amount of a specified foreign currency. It entered into 10 such agreements starting in December 1967 and through 1968, and 8 such agreements in 1969 and 1970. All of the transactions are summarized in the tables on pp. 219 and 220.

On December 1, 1967, petitioner entered into a contract with Chase Manhattan Bank (Chase), where it maintained an account, to sell and deliver 25 million French francs for $5,117,500 on March 5, 1968. On March 1, 1968, delivery was deferred until June 5, 1968. On June 4, 1968, petitioner entered into a contract to purchase 25 million French francs for $5,040,625 from Chase Manhattan Bank, to be delivered on June 5, 1968. Since the sale and purchase contracts were with the same bank, no transfer or actual delivery of currency was effected. Chase simply offset the obligations against each other. Since the result of the offset was

## THE HOOVER COMPANY

### Summary of Foreign Currency Agreements

| Item number | Date of forward sale contract | Delivery date | Bank | Principal amount of foreign currency | Sale price of currency | Date of purchase contract GR purchase |
|---|---|---|---|---|---|---|
| 1 | {12/1/67, 3/1/68} | 3/5/68, 6/5/68 | Chase | Fr. F. 25,000,000 | $5,117,500 | 16/4/68 |
| 2 | 12/8/67 | 3/12/68 | Bankers | NKr 7,215,007 | $1,000,000 | [1]3/11/68 |
| 3 | 1/16/68 | 7/16/68 | Chase | SKr 7,897,500 | $1,500,000 | 16/4/68 |
| 4 | 1/19/68 | 7/22/68 | Chase | Can $1,000,000 | $906,000 | [1]7/18/68 |
| 5 | 1/19/68 | 7/22/68 | Chase | Can $1,103,144 | $1,000,000 | [1]7/18/68 |
| 6 | 1/19/68 | 7/22/68 | Manufacturers | Can $1,102,536 | $1,000,000 | [1]7/18/68 |
| 7 | 1/19/68 | 7/22/68 | Bankers | Can $2,205,558 | $2,000,000 | [1]7/19/68 |
| 8 | 7/17/68 | 10/21/68 | Bankers | SKr 7,878,151 | $1,499,606 | [1]10/18/68 |
| 9 | 9/3/68 | 12/3/68 | Chase | Fr. F. 26,000,000 | $5,153,200 | [1]11/27/68 |
| 10 | 5/31/68 | 8/30/68 | Union-Swiss | Fr. F. 26,001,040 | $5,000,000 | 8/30/68 |
| 11 | 5/29/69 | 6/4/69 | Chase | Fr. F. 26,000,000 | $5,089,175 | 16/2/69 |
| 12 | 6/5/69 | 1/6/70 | Chase | Fr. F. 26,595,745 | --- | --- |
| 13 | 1/2/69 | 1/6/70 | Chase | UK £2,000,000 | $4,622,000 | [1]12/31/69 |
| 14 | 1/14/69 | 1/16/70 | Chase | UK £1,500,000 | $3,467,250 | 11/14/70 |
| 15 | 1/17/69 | 1/20/70 | Chase | UK £750,000 | $1,734,750 | 11/16/70 |
| 16 | 1/20/69 | 1/22/70 | Chase | UK £1,000,000 | $2,315,000 | [2]1/20/70 |
| 17 | 1/22/69 | 1/23/70 | Chase | UK £1,000,000 | $2,318,000 | [2]1/20/70 |
| 18 | 1/28/69 | 1/30/70 | Chase | UK £1,000,000 | $2,316,500 | [2]1/27/70 |

[1]With same bank identified in the same line in col. 4.
[2]With United California Bank International.

## THE HOOVER COMPANY

### Summary of Foreign Currency Agreements

| Item number | Purchase price of currency | Date of debit (credit) | Date of sale of contract Re: Manufacturers Hanover Trust (London branch) | Gain to Hoover on sale | Amount paid to or (paid by) Hoover |
|---|---|---|---|---|---|
| 1 | $5,040,625 | 6/4/68 | | | $76,875 |
| 2 | 1,010,678 | 3/12/68 | | | ($10,678) |
| 3 | 1,527,771 | 7/16/68 | | | ($27,771) |
| 4 | 1,959,710 | 7/22/68 | | | ($53,710) |
| 5 | 1,027,564 | 7/22/68 | | | ($27,564) |
| 6 | 2,054,918 | 7/22/68 | | | ($54,918) |
| 7 | 1,522,846 | 10/18/68 | | | ($23,240) |
| 8 | 5,246,800 | 11/29/68 | | | ($93,600) |
| 9 | 5,230,437 | [1]8/30/68 | | | ($230,437) |
| 10 | 5,228,275 | 6/4/69 | | | ($139,100) |
| 11 | | | 12/31/69 | $218,617.94 | |
| 12 | | | | | |
| 13 | 4,800,000 | 1/6/70 | | | ($178,000) |
| 14 | 3,600,000 | 1/28/70 | | | ($132,750) |
| 15 | 1,800,525 | 1/20/70 | | | ($65,775) |
| 16 | 2,400,100 | 11/22/70 | | | ($85,100) |
| 17 | 2,400,900 | 11/23/70 | | | ($82,900) |
| 18 | 2,401,900 | 11/30/70 | | | ($85,400) |

[1]Actual currency delivered.

a net balance in favor of petitioner, Chase credited petitioner's account $76,875.

On December 8, 1967, petitioner entered into a forward sale contract with Bankers Trust to sell and deliver 7,215,007 Norwegian kroner for $1 million on March 12, 1968. On March 11, 1968, petitioner entered into a contract to purchase the same amount of kronor from Bankers Trust for $1,010,678 for delivery on March 12. As in the preceding transaction, the purchase contract and sale contract were offset against each other. Since petitioner did not have an account with Bankers Trust, it transferred $10,678 from its account at Chase to Bankers Trust to pay the net balance in favor of Bankers Trust.

On January 16, 1968, petitioner contracted to sell 7,897,500 Swedish kronor to Chase for $1,500,000 to be delivered on July 16, 1968. On June 4, 1968, petitioner purchased 7,897,500 Swedish kronor from Chase for $1,527,771 for delivery on July 16, 1968. Once again, the contracts were offset against each other. Since the offset resulted in a net balance in favor of the bank, Chase debited petitioner's account $27,771.38 on July 16, 1968.

On January 19, 1968, petitioner entered into two forward sale agreements with Chase to sell a total of $2,103,144 Canadian dollars for $1,906,000 to be delivered on July 22, 1968. On July 18, 1968, petitioner contracted to purchase for $1,959,710 the same number of Canadian dollars from Chase for delivery on July 22, 1968. These agreements were offset against each other on July 22, 1968, and Chase debited petitioner's account $53,710.

Similarly, on January 19, 1968, petitioner entered into forward sale agreements with Manufacturers Hanover and Bankers Trust to deliver on July 22, 1968, $1,102,536 and $2,205,558 Canadian dollars, for $1 million and $2 million, respectively. Petitioner, 4 days before delivery was due, entered into contracts to purchase from Manufacturers Hanover and Bankers Trust, Canadian dollars in an amount equal to its obligation to deliver under the respective sale contracts for delivery July 22, 1968. On that date, the contracts were offset against each other. Petitioner's account at Manufacturers Hanover was debited $27,564. Petitioner's loss on the offset of its contracts with Bankers Trust was paid by petitioner's debiting its account at Chase and transferring $54,918 to Bankers Trust.

On July 17, 1968, petitioner entered into a forward sale agreement with Bankers Trust to sell 7,878,151 Swedish kronor

for $1,499,606 and deliver on October 21, 1968. On October 18, 1968, petitioner contracted to purchase from Bankers Trust 7,878,151 Swedish kronor for $1,522,846 for delivery on October 21, 1968. Following the procedure laid down in earlier transactions, the contracts were offset against each other. The net balance being in the bank's favor, petitioner transferred $23,241 from its account at Chase to Bankers Trust.

On September 3, 1968, petitioner contracted to sell Chase 26 million French francs for $5,153,200 to be delivered on December 3, 1968. On November 27, 1968, petitioner contracted to purchase 26 million francs for $5,246,800 from Chase for delivery on December 3, 1968. In the subsequent offset, petitioner's account was debited $93,600 to pay the net balance in Chase's favor.

On May 31, 1968, petitioner contracted to sell 26,001,040 French francs for $5 million to the Union Bank of Switzerland (Union) to be delivered on August 30, 1968. On August 28, 1968, 2 days before the scheduled delivery date, petitioner arranged with Chase to purchase and transmit to Union the 26,001,040 French francs petitioner was obligated to deliver on or before August 30, 1968. As is noted by the memorandum pertaining to the "cable transfer," the cost of the francs exceeded by $230,437 the amount due petitioner under its contract to sell to Union. After offsetting the amount received by petitioner from Union with the purchase price of the francs, petitioner's account at Chase was debited $230,437.

On May 29, 1969, petitioner contracted to sell 26 million French francs for $5,089,175 to Chase to be delivered on June 4, 1969. Thereafter, on June 2, 1969, petitioner contracted to purchase 26 million French francs for $5,228,275 from Chase to be delivered on June 4, 1969. After offsetting the contracts, petitioner's account at Chase was debited $139,100.

On June 5, 1969, petitioner contracted to sell 26,595,745 French francs to Chase to be delivered on January 6, 1970. On December 31, 1969, petitioner sold the contract to Manufacturers Hanover, London Branch, at a gain of $218,617.94. Petitioner reported this gain as ordinary income.

On January 2, 1969, petitioner contracted to sell 2 million British pounds sterling to Chase for $4,622,000 to be delivered on January 6, 1970. On December 31, 1969, petitioner contracted to buy 2 million British pounds sterling for $4,800,000 from Chase for delivery on January 6, 1970. As in the preceding transactions,

the contracts were offset against each other and petitioner's account at Chase was debited $178,000.

On January 14, 1969, petitioner contracted to sell 1,500,000 British pounds sterling to Chase for $3,467,250 to be delivered on January 16, 1970. Two days before delivery was due under the sale contract, petitioner contracted to buy 1,500,000 British pounds for $3,600,000 from Chase to be delivered on January 16, 1970. Petitioner used these pounds to satisfy its obligation under the contract and petitioner's account at Chase was debited $132,750 to reflect its loss on the offset of the sale and purchase contracts.

On January 17, 1969, petitioner contracted to sell 750,000 British pounds sterling to Chase for $1,734,750 to be delivered on January 20, 1970. On January 16, 1970, petitioner contracted to buy 750,000 British pounds sterling for $1,800,525 from Chase for delivery on January 20, 1970. Petitioner used these pounds to satisfy its obligation under the contract and petitioner's account at Chase was debited $65,775 to reflect its loss on the offset of the contracts.

On January 20, 1969, petitioner contracted to sell 1 million British pounds sterling to Chase for $2,315,000 to be delivered on January 22, 1970. On January 20, 1970, petitioner purchased 1 million British pounds sterling from United California Bank International (UCBI) for $2,400,100. UCBI delivered these pounds at petitioner's instruction to the London branch of Chase to satisfy petitioner's obligation under the forward sale contract.

On January 22, 1969, petitioner contracted to sell 1 million British pounds sterling to Chase for $2,318,000 to be delivered on January 23, 1970. On January 20, 1970, petitioner purchased 1 million British pounds sterling from UCBI for $2,400,900. UCBI delivered these pounds at petitioner's instruction to the London branch of Chase to satisfy petitioner's obligation under the forward sale contract.

On January 28, 1969, petitioner contracted to sell 1 million British pounds sterling to Chase for $2,316,500 to be delivered on January 30, 1970. On January 27, 1970, petitioner purchased 1 million British pounds at the London branch of Chase to satisfy petitioner's obligation under the forward sale contract.

Generally, in closing its obligation under the various forward sale agreements, petitioner's representatives, a few days before the maturity of the contract which it had sold forward, would

arrange to cover the sale. When this occurred within 2 days of the settlement date on the forward sale contract, it was regarded as a "spot" contract, rather than a forward purchase contract, because "spot transactions" ordinarily require 2 days for settlement.

Petitioner did not have a set practice of settling its obligations under the forward sale contracts in any particular way. When the obligation under a forward sale contract was to be satisfied by the purchase of a forward purchase contract, or spot, petitioner would call on several banks, not just the one to whom it was obligated to deliver, to obtain the best price available for the currency necessary to deliver in satisfaction of the forward sale contract.

In all the forward sale contracts in 1968, except the one with Union Bank of Switzerland, the contracts were settled in the following manner: Petitioner would enter into a *second* agreement with the *same* bank, this time for the purchase by petitioner from such bank of the same amount of foreign currency for delivery on the *same* delivery date specified in the earlier agreement. Prior to the delivery date specified in the first agreement, usually by a few days but in one case by more than a month, a second agreement was entered into with such bank. The bank, which was then holding *two* agreements with petitioner, one for the sale by petitioner *to* such bank, and one for the purchase by petitioner *from* the same bank, of identical amounts of foreign currency for delivery on the same date, would simply offset the obligations against each other. If, as was the case in all of the transactions in 1968 except one, the result of the offset was a net balance in favor of the bank, the bank would debit petitioner's account at the bank in the amount of the difference in U.S. currency. In the transactions with Bankers Trust, petitioner did not maintain an account. It was therefore necessary to transfer the net amount of the offset owed Bankers Trust from petitioner's account at Chase. In the one transaction in which the net balance favored petitioner, the bank credited its account at the bank. Usually such offsetting, and such debiting or crediting, was on or prior to the specified delivery date. In 1969, four forward sale agreements with Chase were closed in the same manner.

In none of the transactions in 1968 and 1969 with Chase,

Bankers Trust, or Manufacturers Hanover, was any foreign currency ever *physically* exchanged or delivered.

The transaction with Union Bank of Switzerland in 1968 was not closed by an offsetting purchase contract with the *same bank* for delivery on the same date as the forward sale contract. Instead, petitioner arranged to purchase from Chase the requisite number of francs to meet its obligation under the Union forward sale contract. Similarly, petitioner in 1970 met obligations under three separate forward sale agreements for pounds sterling with Chase by purchasing such pounds from UCBI a few days before the delivery date and having UCBI transfer such pounds to Chase.

Finally, petitioner sold its interest in a forward sale contract with Chase to Manufacturers Hanover Trust on December 31, 1969. The forward sale contract had been entered into on June 5, 1969, and the delivery date under the contract was January 6, 1970.

For Federal income tax purposes, petitioner consistently treated its net gains and its net losses with respect to forward currency transactions as ordinary income or as ordinary losses.

Petitioner entered into the currency transactions in respect of its exposure in French francs because it was indirectly the owner of a 77-percent interest in the French subsidiary. Similarly, petitioner held the same indirect percentage interest in its Scandinavian subsidiaries (Denmark, Finland, and Norway). Petitioner's currency transactions in Canadian dollars were also related to its net exposure in its 100-percent interest in its Canadian subsidiary. Finally, petitioner's transactions in British pounds sterling closely approximated its net exposure in Hoover Ltd.

Petitioner never intentionally "hedged" an amount in excess of its interest in the net asset value of the foreign subsidiary. The acknowledged purpose of these transactions was to offset any potential exchange losses on its consolidated financial report. Although petitioner did not enter in these transactions with the expectation of gain in the speculative sense, it was fully aware that an intervening devaluation of foreign currencies, in which it had entered into a forward sale contract at a predevaluation price and in which it had not made purchases for delivery, would produce a taxable gain for the corporation. Although it is true that such gains from a devaluation would offset financial

report exchange losses, such exchange losses had no definitely cognizable, immediate, or direct economic effect on petitioner's day-to-day business operations income. There was no relationship between any of the forward sale contracts and a flow of cash from a subsidiary to petitioner, i.e., neither its account receivables or payables to the subsidiary, dividends to be paid by the subsidiary to petitioner, nor any other transfers of cash or assets were a factor in determining its devaluation risk.

Petitioner did not own any of the assets included in the "net exposure" calculations. Petitioner's economic interest in those assets was represented by direct or indirect ownership of stock in the corporation that owned the assets.

## OPINION

The primary issue in controversy here is whether gains and losses from petitioner's transactions in forward foreign currency agreements constitute ordinary gains and losses or ordinary business expenses or capital gains and losses. If we decide that such gains and losses were capital in nature, we must also decide whether the gains and losses are entitled to short-term or long-term treatment.

Petitioner entered into an aggregate of 18 different forward sale agreements in which it agreed to deliver to various banks at a future date and for a set price in U.S. dollars a certain quantity of foreign currency.

These forward sale agreements were entered into by petitioner to (1) offset a potential decline in the value of petitioner's ownership interest in the subsidiary if a devaluation of the subsidiary's home currency occurred; (2) offset exchange losses, unrealized and unrecognized for tax purposes, reported on its consolidated financial reports; and (3) minimize the negative financial impact on petitioner from such losses on its financial reports.

The amount of currency sold forward bore a close relationship to the net assets of certain of petitioner's subsidiaries believed subject to a devaluation risk in their home currencies. Thus, if a devaluation did occur, the gains realized on the forward sale contracts would offset the exchange losses on petitioner's financial reports and minimize the negative effect on petitioner's financial image. Petitioner did not enter into these agree-

ments with the intent to speculate in the pejorative sense, but it did intend to have these transactions produce taxable gain.

Petitioner did not have a set practice of settling its obligation under these contracts. Ordinarily it would shop around for the best available purchase price to obtain the currency necessary to meet its obligations under the 18 forward sale contracts. In 13 instances the petitioner entered into a purchase agreement with the same bank with which it had the sale contract. In each instance, the purchase agreement would be for the same amount of currency petitioner had to deliver under the sale contract. Delivery of the currency would be geared to the delivery date specified in the sale contract. Since the obligations to buy and sell were with the same bank, no currency physically changed hands. Rather, the bank and petitioner agreed that the purchase and sale contracts would be netted against each other. Any net balance in favor of the bank would be paid by petitioner. Any net balance in favor of petitioner would be credited to petitioner's account at the bank. In 12 of the 13 sale contracts settled in this manner, the petitioner suffered a loss. On one occasion, the petitioner realized a gain.

Petitioner, in satisfaction of four forward sale agreements, purchased currency from a bank different from the bank with which it had the forward sale agreement. The currency purchased was then physically delivered in satisfaction of its sale obligation. In each of the four physical delivery situations, the price paid for the foreign currency by petitioner was greater than the amount received by it in the subsequent disposition. Accordingly, petitioner suffered a loss on each of these transactions.

Finally, on one occasion, petitioner sold its interest in a forward sale contract with Chase to Manufacturers Hanover Trust on December 31, 1969. The forward sale contract had been entered into on June 5, 1969, and the delivery date under the contract was January 6, 1970.

Petitioner advances four arguments why its gains and losses should be treated as ordinary. First, it contends the forward sale agreements constitute bona fide hedging transactions against a decline in the value of its stock investment in its subsidiaries subject to devaluation risk. Petitioner expressly does not rely on *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), or its progeny, as a basis for a decision in its favor. Petitioner

also does not argue for application of our initial holding in *International Flavors & Fragrances, Inc. v. Commissioner*, 62 T.C. 232 (1974).

Second, petitioner maintains that the losses incurred here represent a form of insurance expense deductible under section 162[3] as ordinary and necessary business expenses.

Third, petitioner argues that in certain of the transactions where it purchased currency to meet its obligations, the currency so purchased does not constitute a capital asset and, thus, either section 1233 or the general sale or exchange rules are inapplicable.[4]

Finally, petitioner asserts that in certain of its transactions the requirement of "sale or exchange" or "closure" under section 1233 was not met since offsetting purchase contracts entered into by petitioner should be considered a "release."

Respondent, on the other hand, contends that the forward sale agreements do not constitute hedges as that term has been previously interpreted and applied. Moreover, even if it is a hedge, it is a hedge of a capital asset and not within the purpose of the rule mandating ordinary treatment of gains and losses. In addition, respondent asserts that *Corn Products* is inapplicable.

Respondent also challenges petitioner's argument that the losses constitute insurance expenses deductible under section 162. It is respondent's view that a risk is not being protected by these transactions and that the cases cited by petitioner do not support its position.

Petitioner's third argument, respondent asserts, would nullify section 1233. Additionally, respondent seeks to distinguish the cases cited by petitioner.

Finally, respondent urges that the transactions be treated in the manner in which petitioner arranged them—as offsetting contracts. Respondent maintains in this regard that in form and substance the petitioner did not view these offsets as releases.

Webster's New Collegiate Dictionary defines a "hedge" as "a means of protection or defense (as against financial risk)" or to "protect oneself financially: as a: to buy or sell commodity futures as a protection against loss due to price fluctuation, b: to

---

[3]All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.

[4]By analogy, petitioner would extend this argument to those transactions in which an offsetting purchase contract rather than currency was used to close the transaction.

minimize the risk of a bet." Whether these broad definitions have been or should be the meaning of the term "bona fide hedge," as it is applied in tax controversies, is the crux of this case.

Early administrative recognition of the use of hedges in commodity futures appeared in G.C.M. 17322, XV–2 C.B. 151 (1936). The ruling involved a textile manufacturer, who, as a means of protecting itself against fluctuations in the price of cotton, entered into a series of transactions in cotton futures which resulted in a net loss. The Commissioner noted that such futures transactions, if speculative in nature, would ordinarily result in capital treatment of any gains or losses. Nevertheless, the Commissioner examined the relationship of the future transactions to the business the taxpayer was engaged in and concluded that future transactions,

which eliminate speculative risks due to fluctuations in the market price of cotton and thereby tend to assure ordinary operating profits, are common trade practices and are generally regarded as a form of insurance (the only kind available against such risks) necessary to conservative business operation. [G.C.M. 17322, XV–2 C.B. 152.]

In the Commissioner's ruling, it was readily apparent that a "hedge in commodity futures" represented an effort to offset actual purchases and sales of the commodity with an equivalent amount on a future sale or purchase contract, respectively. These futures, and their eventual sale or satisfaction, would offset any operational losses that might be incurred in the day-to-day business operation of the enterprise. For example, the ruling indicated two situations in which such transactions would be treated as a hedge:

(1) The taxpayer buys quantities of spot cotton, which will necessarily be on hand for some months before being manufactured into goods and sold. In order to be protected against losses which would be incurred if the cotton market declined during those months, the taxpayer, at the same time the above purchases are made, enters into futures sale contracts for the delivery of equivalent amounts of cotton a few months hence. As the above quantities of spot cotton are subsequently disposed of by sales from time to time of manufactured cotton goods, the above futures sale contracts are concurrently disposed of by futures purchase contracts which serve as offsetting transactions closing out the futures sale contracts.

(2) The taxpayer makes contracts for future delivery of cotton goods, the manufacture of which will require more cotton than the amount on hand or the amount which can be immediately purchased advantageously. In order to secure protection against a rising cotton market during the months that

intervene between the date of the order for cotton goods and the agreed delivery date, the taxpayer, at the same time the above orders are taken, enters into futures purchase contracts for cotton in amounts necessary to provide the desired protection. As the taxpayer from time to time buys spot cotton for the manufacture of the goods specified in the above orders, the futures purchase contracts are disposed of by futures sale contracts which serve as offsetting transactions closing out the futures purchase contracts.

Accordingly, the Commissioner concluded that:

Where futures contracts are entered into only to insure against the above-mentioned risks inherent in the taxpayer's business, the hedging operations should be recognized as a legitimate form of business insurance. As such, the cost thereof (which includes losses sustained therein) is an ordinary and necessary expense deductible under section 23(a) of the Revenue Act of 1934 and corresponding provisions of prior Revenue Acts. Similarly, the proceeds therefrom in the form of gains realized upon hedging transactions are reflected in net income, either indirectly by compensating for losses realized on the sale of spot cotton thereby making such losses nondeductible, or directly by their inclusion in income as compensating for fluctuations in the market price of cotton adversely affecting the selling price of cotton goods or the cost of raw materials necessary to the manufacture thereof. [G.C.M. 17322, XV-2 C.B. 152.]

This limited concept of what constituted a "bona fide hedge" was also reflected in the early judicial opinions dealing with such transactions in commodity futures.

In *Grote v. Commissioner*, 41 B.T.A. 247 (1940), we held that the purchase and sale of wheat futures, made entirely for protection against fluctuation by a taxpayer in the business of wheat farming, constituted a bona fide hedge and that the losses sustained in trading the futures were ordinary losses.

In *Battelle v. Commissioner*, 47 B.T.A. 117 (1942), we again dealt with the treatment to be afforded certain dealings in commodity futures. We viewed the basic principle in determining whether trading in commodity futures constituted a hedge or mere speculation as to whether the taxpayer was trying to maintain an even or balanced market position in the particular commodity used in his trade or business. Upon an examination of the futures and the actuals, we determined that few of the transactions could be denominated "hedges." Accordingly, the losses incurred were capital losses.

In *Commissioner v. Farmers & Ginners Cotton Oil Co.*, 120 F.2d 772 (5th Cir. 1941), revg. 41 B.T.A. 1083 (1940), cert. denied 314 U.S. 683 (1941), the Fifth Circuit examined a situation in which a taxpayer who produced crude cottonseed oil engaged in

trading commodity futures in refined oil, ostensibly for price protection against changes in the market price of crude. No futures market then existed in crude oil. The Board of Tax Appeals had previously held that these futures constituted hedges. The Fifth Circuit, however, did not agree. Although it conceded that a price relationship between crude and refined oil existed, the Court concluded that:

> a hedge is a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of commodity. The basic principle of hedging is the maintenance of an even or balanced market position. To exercise a choice of risks, to sell one commodity and buy another, is not a hedge; it is merely continuing the risk in a different form. That is what the taxpayer did in this case. It did not retain its crude oil and sell refined; it sold crude and bought refined when it had no actual commodity on hand or future commitments to be protected from price variations. [120 F.2d at 774.]

It was not necessary that the commodity future be in the same commodity actually purchased or sold in the taxpayer's business. As long as the taxpayer could successfully demonstrate a balanced market position and that the movement in price of a commodity in which the future was held bore a close resemblance to the commodity used as a raw material in taxpayer's manufacturing process or in its inventory, the transactions would constitute a hedge. In *Trenton Cotton Oil Co. v. Commissioner*, 147 F.2d 33 (6th Cir. 1945), revg. and remanding a memorandum opinion of this Court (2 T.C.M. 1172, 12 P–H Memo par. 43, 1715), the Sixth Circuit similarly found the requisite "balanced market position" to be lacking in a case where a taxpayer, engaged in cottonseed crude oil production, traded commodity futures in refined oil. It stated:

> Before such a loss may become allowable as a business expense, it must be made to appear that a contract has been entered into for the sale and delivery of a product at a future date and that there is a counter contract for the purchase of the same product for future delivery or one so akin to it that it affects the price of the former. The whole theory is that when the price goes up or down the gain on one transaction will offset the loss on the other. The price relationship, as shown by the evidence, between crude and refined oil is so intimate that the purchase of the latter for future delivery may be used as an insurance against risk of loss on the former sold for future delivery and the same is true as to the price relationship between refined oil and cottonseed.
>
> The real question here is whether petitioner's contracts for the purchase of refined oil futures were made to protect it against loss on the purchases of cottonseed or on the sale of crude oil for future delivery.

The Tax Court found as a fact that petitioner's purchases were not for that purpose. This finding is supported by substantial evidence. [147 F.2d at 35.]

See also *Stewart Silk Corp. v. Commissioner*, 9 T.C. 174 (1947); *Estate of Makransky v. Commissioner*, 5 T.C. 397 (1945), affd. 154 F.2d 59 (3d Cir. 1946); *United States v. Rogers*, 286 F.2d 277 (6th Cir. 1961), cert. denied 366 U.S. 951 (1961).

Although the hedging concept had been subject to judicial development, no express statutory provision mandated such a result. Absent a judicial determination that a taxpayer was engaging in a bona fide hedge, trading in commodity futures, either by sale or satisfaction, would result in capital treatment. In 1950, to limit abuses prevalent in the securities and commodities markets with respect to short sales, Congress amended section 117 of the 1939 Code to prevent manipulation of the holding period rules as applied to certain short sales so that short-term gain and long-term loss could not be converted into long-term gain and short-term loss, respectively. These provisions were made applicable to short sales of commodity futures. However, the committee reports indicate that "hedging operations by operators of grain elevators, etc. which give rise to ordinary gain or loss * * * are not subject to the rules." H. Rept. 2319, 81st Cong., 2d Sess. 94–96 (1950); S. Rept. 2375, 81st Cong., 2d Sess. 85–86 (1950); Conf. Rept. 3124, 81st Cong., 2d Sess. 28 (1950).

Statutory recognition of the hedging exception first appeared in the 1954 Code. As initially enacted, section 1233(a) provided that:

gain or loss from the short sale of property, other than a hedging transaction in commodity futures, shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.

The legislative history relating to the enactment of the 1954 Code does not provide any basis for an assumption that Congress intended to extend the concept of "bona fide hedge" beyond its limited judicial development. In 1958, Congress amended section 1233 by deleting the hedging exclusion from subsection (a) and placing it in a new subsection (g). This amendment, Congress believed, would prevent any unintended application of any of the subsections of section 1233 to bona fide hedging transactions.

In 1955, the limited concept of hedging, with its strict

requirements of balanced market position and relationship of the commodity future to the business operations of the taxpayer, was blurred by the decision in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), affg. 215 F.2d 513 (2d Cir. 1954), affg. 16 T.C. 395 (1951), as supplemented 20 T.C. 503 (1953). In *Corn Products*, the taxpayer was engaged in the production of distilled products from corn. Fearing price increases in the raw corn needed in its manufacturing operations, the taxpayer purchased forward corn futures to protect itself, some of which it eventually accepted in delivery, and some of which it sold. The Supreme Court did not view this as a true hedge but nevertheless decided that the gain arising from the sale of the forward purchase contracts was ordinary income. It said:

> We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation. [350 U.S. at 50.]

> \*      \*      \*      \*      \*      \*      \*

> Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. [350 U.S. at 52.]

This doctrine, denominated as "the integral part of business," has been applied in many differing situations to convert what would otherwise be capital gains and losses into ordinary gains and losses. See *Schlumberger Technology Corp. v. United States*, 443 F.2d 1115 (5th Cir. 1971); *Steadman v. Commissioner*, 424 F.2d 1 (6th Cir. 1970), affg. 50 T.C. 369 (1968), cert. denied 400 U.S. 869 (1970); *Waterman, Largen & Co. v. United States*, 189 Ct. Cl. 364, 419 F.2d 845 (1969), cert. denied 400 U.S. 869 (1970); *John J. Grier Co. v. United States*, 328 F.2d 163 (7th Cir. 1964); *Booth Newspapers, Inc. v. United States*, 157 Ct. Cl. 886, 303 F.2d 916 (1962); *Commissioner v. Bagley & Sewall Co.*, 221 F.2d 944 (2d Cir. 1955), affg. 20 T.C. 983 (1953); *Chemplast, Inc. v.*

*Commissioner*, 60 T.C. 623 (1973), affd. by unpublished opinion (3d Cir. 1974).

To the extent that a bona fide hedge constitutes an integral part of the operation of a business, the *Corn Products* decision is merely cumulative. On the other hand, *Corn Products* readily demonstrates that, in situations which do not constitute a true hedge, ordinary treatment of gains and losses on certain property transactions will be appropriate if a sufficient and direct relationship to the taxpayer's ordinary and operating aspects of its business is shown. In applying *Corn Products*, consideration must be given to the factual background of the transaction, the needs of the particular business during that period, and the intention of the taxpayer. *Booth Newspapers, Inc. v. United States*, 157 Ct. Cl. 886, 303 F.2d 916 (1962); *Chemplast, Inc. v. Commissioner*, 60 T.C. 623, 631 (1973).

In the period subsequent to the *Corn Products* decision, application of the bona fide hedging principle and the "integral part of the business" doctrine have generally been melded together in cases involving commodity future transactions. In this regard, this Court has dealt with two cases in which gains and losses from foreign currency future transactions were treated as ordinary under a *Corn Products* and hedging rationale.

In *Wool Distributing Corp. v. Commissioner*, 34 T.C. 323 (1960), the taxpayer was a dealer in foreign wools. Fearing a devaluation of foreign currencies which would lower the market price of foreign wools and thereby lower the value of its inventory, the taxpayer sold currency short in an amount equal to its holdings in foreign wools. Citing G.C.M. 17322, XV–2 C.B. 151, and *Corn Products*, we held that these transactions were in the nature of a bona fide hedge and thus connected so closely with the regular conduct of the taxpayer's business as to defy classification as an extraneous investment. (34 T.C. at 331.) The use of currency futures to hedge inventory valuation was considered acceptable since the "devaluation of these currencies would have effected an immediate reduction in the price of" the foreign wools. (34 T.C. at 331.)

In 1974, we held in *International Flavors & Fragrances, Inc. v. Commissioner*, 62 T.C. 232 (1974), that a foreign currency forward sale contract entered into by a taxpayer constituted a "loose hedge" against potential devaluation losses incurred by

taxpayer's foreign subsidiaries. Accordingly, the gain realized on the sale of the contract right was held to be ordinary income. The taxpayer had initially argued that its "hedge" was against a possible decline in the value of its stockholdings in the subsidiary and, therefore, that *Corn Products* did not apply because it was not protecting items of ordinary income but property held for investment. We rejected that argument. Instead, we agreed with the respondent that the taxpayer's real purpose was to protect against operational losses incurred by the subsidiaries in their daily business, losses which we considered to be that of the parent, and the futures transaction was treated as an integral part of business. *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955).

Judge Tannenwald, in his concurring opinion, eschewed issues relating to the reaches of the "integral part of the business" doctrine and to the applicability of section 1233, either directly or by analogy to transactions of the type involved therein. Rather, he concluded that the purported sale of the contract was a sham, that the subsequent purchase contract to close the short sale entered into by the purchaser of the short-sale contract was purchased on behalf of the taxpayer, and that the gain realized was short-term capital gain.

Judge Hall, however, disagreed with the majority opinion. In her dissent it was stated that:

> although respondent asserts, and the Court holds, that the contract is caught within the sweep of the *Corn Products* doctrine, this cannot be so. *Corn Products* teaches that capital gain treatment is reserved for "transactions in property which are not the normal source of business income." 350 U.S. 46, 52 (1955). The contract here and the property (pounds) were clearly not the normal source of petitioner's business income. There is no indication that the transaction was recurring. As such, it was unlike that in *Corn Products*. Intended, as the majority finds it was, to offset possible anticipated decline in the dollar value of the sterling subsidiary's stock, the transaction was more closely related to that stock, a capital asset in petitioner's hands, than to the subsidiary's routine business operations. While the majority refers to currency hedges as "part and parcel of a multinational business," there is no evidence that this transaction was routine or customary for petitioner. Furthermore, nothing in the evidence or findings justifies us in ignoring the separate corporate identities of petitioner and its subsidiary. The business of the subsidiary was not that of the parent. *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949); *Moline Properties v. Commissioner*, 319 U.S. 436 (1943). [62 T.C. at 244.]

On appeal to the Second Circuit, the Government did not

continue to argue *Corn Products* but took the approach enunciated in Judge Tannenwald's concurring opinion. The Second Circuit reversed (524 F.2d 357 (2d Cir. 1975)) and remanded the case for a determination if the sale was in fact bona fide. In its reversal, the Second Circuit expressly stated that the Government's "sudden diffidence on application of *Corn Products* may be well advised." (524 F.2d at 360.) On remand, we held that the sale was bona fide and that the gain was long-term capital gain, the contract having been held for more than 6 months. T.C. Memo. 1977–58.

Petitioner, as noted earlier, specifically disavows any intention to rely on the *Corn Products* rationale set forth in our original *International Flavors & Fragrances* opinion. Unlike *International Flavors & Fragrances*, we have found in this case that petitioner's intent, upon entering into the various forward sale agreements, was to (1) protect the value of its stock ownership in its subsidiaries subject to devaluation risk, and (2) offset required financial reporting losses due to currency fluctuations. Nevertheless, the transactions entered into by petitioner here and the taxpayer in *International Flavors & Fragrances* bear a striking resemblance in terms of offsetting financial report exchange losses and the amount of currency sold compared to the net exposure in their subsidiaries' assets as expressed through stock ownership. It is therefore necessary for us to reconsider our initial position in *International Flavors & Fragrances*.[5]

The potential exchange losses of the subsidiary, we think, cannot be truly considered to be the losses of the parent corporation. Any effort to equate the former's losses to the latter's would be to ignore the separate entities that have been specifically and intentionally created. *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949); *Moline Properties v. Commissioner*, 319 U.S. 436 (1943). Surely, if a corporation decides not to open a foreign branch where ownership of the assets subject to devaluation loss would be direct, but rather sets up a foreign subsidiary for tax advantages present in such form, it ill

---

[5]Respondent has argued that *Corn Products* is not applicable to these transactions. Petitioner, in its brief, states that it is not hedging against its subsidiaries losses, but rather its own losses as represented by a decline in stock value following a devaluation. It expressly disavows any intent to argue *Corn Products* on these losses, but rather maintains that since it has hedged, it is entitled to ordinary treatment.

behooves us to ignore the form that the parent has established. Moreover, we think it is too attenuated to argue generally that potential exchange losses in the subsidiaries' operations which may affect the amount of dividends eventually received by the parent would justify our finding that the losses incurred by the subsidiary are the losses of the parent for application of the *Corn Products* rule. The only "asset" that petitioner can possibly protect is its investment, as expressed in stock ownership, in the foreign subsidiary. That investment, except in limited circumstances, is a capital asset in petitioner's hands. If the subsidiary were liquidated the day after a currency devaluation, any loss recognized on the liquidation would be capital; and any gain would be capital. Secs. 331, 332, and 1248. The same would be true if petitioner decided to sell its interest the day after a devaluation. The touchstone of the *Corn Products* doctrine is that seemingly capital property transactions are entitled to ordinary treatment only when the transactions are an integral part of the taxpayer's day-to-day business operations or are necessary to protect or generate ordinary operating income. These transactions simply do not fit within this broad rule. They are geared to the protection of a stock investment, not the business operation. The fact that petitioner engages in numerous such transactions does not make it an integral part of the business. The necessary link to its business operations is missing.

Accordingly, we conclude that the *Corn Products* doctrine is inapplicable in this case to convert the gains and losses from the various currency transactions into ordinary gains and losses. To the extent that this view is inconsistent with our original holding in *International Flavors & Fragrances*, we will no longer follow that position.

Since we find *Corn Products* inapplicable, we turn to petitioner's main contention that these transactions constitute a "hedge" against (1) the losses required to be shown on the financial reports, and (2) a decline in value of its stock investment in certain foreign subsidiaries. Petitioner urges us to apply the everyday meaning of the term "hedge" and accept as conclusive its contemporaneous labeling of the transactions as "hedges." In addition, petitioner argues that there was a complete lack of "speculative" motive, as demonstrated by the gearing of the amount "hedged" to the exposed assets in the subsidiary subject to devaluation risk. Finally, petitioner asserts

that there is no statutory justification to permit the Commissioner to define the term "hedge" in terms of the limited examples enumerated in section 1.1233–1(b), Income Tax Regs. It argues that since section 1233(g) says "hedge," it should be interpreted in the practical, everyday meaning of the word.

The problem, as we see it, is one of definition. We agree with respondent that these transactions do not constitute "hedges" in commodity futures as that term has been judicially interpreted and applied. The mere fact that petitioner has characterized its transactions as a "hedge" is neither conclusive nor probative on the issue of whether they are or are not hedges for tax purposes. The courts have, we think, developed two primary tests for determining if a commodity future constitutes a "bona fide hedge." First, a hedge is spoken of in the context of a balanced market position. In no conceivable way was petitioner protecting its market position in *its* holdings of currency. It was only protecting a theorized loss in stock value as determined by asset value expressed in U.S. dollars. No credible evidence has been adduced to demonstrate that changes in the stock value of petitioner's subsidiaries is necessarily related to fluctuations in the value of foreign currency. Second, a hedge has always been viewed as a means of protecting ordinary operating profits realized in the day-to-day operation of the business enterprise. Thus, hedges have been permitted against inventory valuation, costs in the manufacturing processes, or receivables. Ordinary business operations are not at issue here.

Petitioner's business was the manufacture and sale of appliances. None of its receivables from intra or intercompany sales payable in foreign currency were hedged, nor were its purchases expressed in foreign currency hedged. Its inventory was not hedged. Simply put, none of the day-to-day operating aspects of petitioner were in any way involved. Rather, petitioner has specifically stated that its purpose was to protect its ownership interest as expressed in stock. Stock is, except in limited circumstances, a capital asset. Assuming for the moment that the value of petitioner's investment declined as a result of a devaluation, its loss, if any, would be capital. Nevertheless, petitioner had no intention of either selling or liquidating. As we have noted earlier, any liquidation of the subsidiary would also result in capital gain or loss, depending on the basis of petitioner's ownership interest. In any event, no proof has been

offered that a decline in the value of stock in the real world of the marketplace is tied to currency fluctuations. Market price or value of stock is subject to more than just a foreign currency variable; the value of petitioner's stock in its subsidiaries reflects a host of other considerations and potentialities.

In connection with this second element is the concept that a "hedge" protects against a true and established risk of loss. Notwithstanding petitioner's frequent manifestations to the contrary, we do not think that the currency transactions protected against a real risk of economic loss to it. Although financial reporting rules require a parent corporation to reduce consolidated earnings by exchange losses (experienced by its subsidiaries) on its consolidated income statement, the exchange losses are neither recognized nor realized for tax purposes. These losses merely represent the worst possible financial picture if the parent corporation were to liquidate its subsidiaries on the day following a devaluation. But, as numerous commentators and corporate financial advisers contend (see, e.g., Bus. Week, Jan. 29, 1979; Wall Street J., Feb. 15, 1979, at 32), the reporting of these losses for accounting purposes does not reflect corporate reality. The subsidiaries here, and in the usual case, continue to operate with the same assets, and an earning potential perhaps greater, perhaps reduced. Dividend payments may or may not decline. The value of the subsidiary stock does not necessarily go up or down because of currency fluctuations. In the final analysis, we are not convinced that a real risk of economic loss, either ordinary or capital in nature, is present under these circumstances.

Petitioner argues that it did not have any speculative motive, but that it was merely trying to offset exchange gains and losses. Although it is true that petitioner did not engage in the pejorative type of speculation, it is clear to us that actual taxable gains or losses, and not an offset, either in the tax or operating sense, would occur from these transactions. Obviously, for financial accounting purposes, $1 of exchange loss would be offset by $1 of currency transaction gain. Nevertheless, there is no proof that the value of petitioner's stock in its subsidiary declined, nor any indication that, if a decline had temporarily occurred, petitioner intended to sell or liquidate the subsidiary. Even so, the gains and losses would be capital. These transactions, we think, more clearly represented a wise investment

technique to offset "poor" financial figures and to prevent a bad financial image for petitioner as a whole. Thus, we are unwilling to convert a wise investment technique into a "hedge" because of a lack of speculation.

Finally, petitioner's argument that a "hedge" must be defined in the parlance of the vernacular and that the regulation which limits the broad statutory language is invalid is without merit. Sec. 1.1233–1(b), Income Tax Regs. The regulation clearly and properly reflects congressional intent as to the meaning of a "hedge" for tax purposes. Section 1233(g) was specifically enacted on the basis of prior case law and administrative rulings. Subsequent judicial development of the term "hedge" has remained consistent with earlier decisions. We cannot accept petitioner's belief that protection against "any risk" is a hedge. The concept of a hedge has remained narrow—to act as a form of insurance in the day-to-day business operations which produce ordinary gains and losses. Acceptance of petitioner's view would deny any sort of capital treatment in any situation in which an individual holds any commodity, thinks its price might go down, and enters into a forward sale agreement to hedge. While "a rose is a rose," a hedge, in the parlance of the vernacular, is not a hedge for tax purposes. Petitioner neither fits within the specific concepts previously enumerated nor the purpose of the hedging exemption to warrant ordinary treatment of its gains or losses. We therefore decline to extend the concept of hedging to petitioner.

Petitioner's next argument is as follows: A hedge is a form of insurance. Insurance premiums are deductible under section 162 or 212. Petitioner was trying to "protect" its stock investment in its foreign subsidiary, but section 212 is not available since petitioner is not an individual. However, since petitioner is in a trade or business, and since sections 212 and 162 are in pari materia, losses incurred in the future transactions should be treated as ordinary and necessary business expenses.

The syllogism, although neat, suffers from the failure of petitioner to satisfy the first essential element necessary to reach the conclusion sought—it has not, as we have previously held, engaged in a bona fide hedge.[6]

---

[6]Moreover, we have strong reservations against treating legitimate hedging losses as insurance business expenses. Petitioner's initial step in his syllogism is derived from certain early decisions and G.C.M. 17322, XV–2 C.B. 151, in which the courts and the Commissioner held that losses in legitimate

Petitioner has offered this syllogism if we did not hold that its transactions constituted a hedge within the meaning of section 1233(g). Obviously, if we do not call the transactions a hedge for section 1233(g), we will not now apply a different meaning to that term here. As we have previously indicated, this transaction did not insure petitioner's investment against risk of loss. It merely was designed to generate gains to offset financial report exchange losses which are neither realized nor recognized for tax purposes. The decline in stock value that petitioner arguably was trying to prevent does not bear, we think, sufficient indicia of relationship to fluctuation in currency exchange rates. No real loss event has been demonstrated here. Petitioner's stock in its subsidiary has not necessarily gone up or down in value as a result of the translation losses shown on the financial reports.

Petitioner cites several cases ostensibly supporting its argument that "protection" of an income-producing asset provides the basis for a deduction under section 212 or 162, depending upon the taxpayer's status. We seriously doubt, however, whether any "protection" of the stock value was accomplished by merely entering into currency futures to achieve gains which would offset anticipated paper exchange losses. In no way did the transactions protect the stock investment from decline in value or income-producing capacities. The cases cited by petitioner are *Newark Morning Ledger Co. v. Commissioner*, 539 F.2d 929 (3d Cir. 1976), affg. 416 F. Supp. 689 (D. N.J. 1975); *Graham v. Commissioner*, 326 F.2d 878 (4th Cir. 1964), revg. 40 T.C. 14 (1963); *Surasky v. United States*, 325 F.2d 191 (5th Cir. 1963); *Allied Chemical Corp. v. United States*, 158 Ct. Cl. 267, 305 F.2d 433 (1962); *Alleghany Corp. v. Commissioner*, 28 T.C. 298 (1957). In our opinion, they are distinguishable. These cases involved proxy fight expenditures incurred by shareholders in order to prevent opposing parties from gaining control and thereby threatening the value of their investments. In all of

---

hedging transactions constitute ordinary and necessary business expenses. Recent cases have viewed such losses as business losses under sec. 165 without regard to sec. 162. Obviously, to the extent that a business loss meets the requirements of sec. 165, it is deductible under sec. 162 as a business loss. Although these early statements do not change what would otherwise be the same tax treatment afforded an ordinary loss under sec. 165 or as a business expense under sec. 162, we think the transactions should properly be viewed as losses from dealings in property and that equating these losses as a business expense is neither technically accurate nor necessary.

these cases, the expenditures in question had a *direct* effect on the operation or management of the corporation whose stock was held by the taxpayer. The expenditures would actually protect the investment. Here, by contrast, there is no relationship between the currency contracts and the maintenance of stock value or the ability of petitioner's foreign subsidiaries to produce income in the future. The gains and losses from the futures represented a gain or loss to petitioner but had no protective impact on the subsidiaries' operations, their assets, or the value of petitioner's stock holding. If, as petitioner asserts, the stock value goes down after a devaluation, it would go down regardless of these currency transactions and whether gain or loss resulted from them.

Petitioner's effort to analogize its situation to the permissible deduction under section 212 for the cost of a safe deposit box to protect investment papers is without merit. The deduction in that situation is predicated on the physical preservation of the stock paper and not any intrinsic value the stock may represent.

Likewise, petitioner's reliance on Rev. Rul. 73–226, 1973–1 C.B. 62, is misplaced. In that situation, a bank's payments to depositors and creditors of its foreign subsidiary (which had defaulted) were not to protect its investment in the subsidiary but rather to prevent a disruption of its own business with the same customers.

Finally, petitioner relies on *Mortenson v. Commissioner*, 3 B.T.A. 300 (1926). In *Mortenson*, the taxpayer was an individual who owned 28 percent of a corporation whose sole asset was a vessel. The corporation failed to insure the vessel and the taxpayer, concerned that destruction of the vessel would render his investment worthless, purchased insurance to protect his investment. The Board of Tax Appeals, with six dissents, held that this expenditure constituted an ordinary and necessary business expense. Unlike the present case, the physical destruction of the corporation's sole asset would have wiped out the taxpayer's investment. It is therefore arguable that a direct relation was present between the premium paid and the protection of the taxpayer's investment if the ship was destroyed. In the present case, the currency transactions in no way tie in with a reduction in the market value of the stock. In addition, the underlying assets of the affected subsidiaries remain intact. We perceive *Mortenson* as an aberration from the

usual rule that a corporate expense must be deducted by the corporation and not by the shareholder who voluntarily incurs such cost. Moreover, *Mortenson* does not fit neatly into the "protection, conservation, and management of property held for investment theory" espoused in the other cases earlier cited by petitioner. We are not inclined to follow *Mortenson* in any oblique manner which would lend support to petitioner's argument.

Petitioner makes two further arguments against capital treatment of the gains and losses realized here. First, it argues that the currency purchased to close certain of the short sales was not a "capital asset" as defined in section 1221(1). Section 1221(1) provides that the term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Accordingly, the sale of such currency would not warrant capital treatment under the general sale or exchange provisions or the specific short sale provision (sec. 1233). By analogy, petitioner extends section 1221(1) to those transactions in which an offsetting purchase contract rather than actual currency was used to close the short sale. Second, petitioner maintains that in certain sale transactions it was released from its performance obligation and that release is neither the equivalent of sale or exchange necessary to invoke the general capital treatment provisions nor satisfies the requirement of "closure" under section 1233.

Prior to our consideration of these two arguments, it is necessary to determine if section 1233 and its subsections are generally applicable to these forward sales in foreign currency. Obviously, if section 1233(a) or its subsections are not applicable, the general sale and exchange and holding period rules regarding capital assets will be applicable, absent our agreement with petitioner on either of its remaining arguments.

Section 1233(a) provides that gain or loss from a short sale shall be considered gain or loss from the sale or exchange of a capital asset to the extent that property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer. No limitation on the term "property" appears in section 1233(a) and, accordingly, we think that this provision clearly applies to the short sale of currency here.

Section 1233(a) does not, however, tell us how to determine the holding period of the property sold short or whether long-

term or short-term treatment is warranted. Rather, we are required to look at either section 1233(b) and (d), if applicable, or the rules under section 1223 to make such determinations. Section 1233(b) and (d), which seeks to convert what would otherwise be long-term gain to short-term gain and short-term loss to long-term loss, respectively, has limited application. For section 1233(b) and (d) to be operative, it is necessary that "substantially identical" property be held or acquired by the taxpayer for the requisite period of time before the short sale or between the date of the short sale and the closing. "Substantially identical" property is defined in section 1233(e)(2)(A) as "stock, securities * * * and commodity futures." If such substantially identical property is acquired less than 6 months before the date of the short sale or between the date of the sale and the closing, any gain will be short-term capital gain, regardless of the holding period of the property used to close the short sale. On the other hand, if substantially identical property is acquired or held for more than 6 months prior to the date of the short sale, any loss on the short sale will be long-term capital loss, regardless of the holding period of the property used to close the short sale.

The requirement that "substantially identical" property be acquired, as defined in section 1233(e), would ostensibly limit the rules under section 1233(b) and (d) to short sales of stocks, securities, and commodity futures in which "substantially identical" property is acquired and used to close the short sale. Thus, although the general rule under section 1233(a) covers a short sale of any property, the section 1233(b) and (d) rules might not apply where a taxpayer sold a commodity short but acquired not a commodity purchase future but the actual currency to close the short sale. We need not, however, determine whether these provisions are applicable here. As we have noted, section 1233(b) seeks to prevent the conversion of short-term gain into long-term gain by manipulation of the holding period rules under section 1223. In all the transactions where petitioner provided either actual currency or a purchase contract (future or spot) in satisfaction of its obligations under the forward sale agreement, the time between the purchase of the currency or the date of the purchase contract and the settlement date under the forward sale was never greater than 1 month. Accordingly, short-term capital gain or loss will result under the general rules enumer-

ated in section 1223 for determining holding periods without regard to section 1233(b). We also note that, in all but one of the "closing" transactions, a loss was recognized. Section 1233(b) does not provide rules for determining if a loss is short term; therefore, section 1223 would be applicable. Section 1233(d), which might convert short-term losses into long-term losses, is also inapplicable since petitioner never held any currency or purchase contract for more than 6 months before the date of any short sale.

Petitioner contends that the foreign currency acquired to cover certain short sales of currency was held "primarily for sale to customers in the ordinary course of business" and, consequently, was not a capital asset. To sustain this argument would eliminate section 1233 from the Code. There is nothing special or unique about petitioner's method of satisfying its obligations under the forward sale agreements. Anyone who sells short and then buys to cover is only buying in order to resell. Under petitioner's argument, anyone who does so would have ordinary income or loss, and section 1233 would cease to apply. That would clearly be a frustration of the purpose of this section. For example, if a taxpayer owned stock in a corporation for more than 1 year, then sold it short, he should have a long-term capital gain or loss on the transaction. If he purchased additional stock during the holding period of the short sale contract, which he then used to close the contract, he should have short-term capital gain or loss under section 1233(b). Under petitioner's reasoning, however, the gain or loss would be ordinary, because the taxpayer purchased the additional stock only to cover his short position. The impact of this would be that anyone who sold short (except for those who were long in the asset sold short and who did not buy to cover during the contract period) would get ordinary gain or loss, contrary to the clear purpose of section 1233.

Petitioner has cited a plethora of cases in support of its position that the currency in its hands is not a capital asset. However, in each of the cases the taxpayer was in a different position than petitioner with respect to the holding of foreign currency or other capital assets. In one group of cases, the taxpayer received the assets in question in exchange for performances rendered or for goods sold. They were basically substitutes for cash. *Gilbert v. Commissioner*, 56 F.2d 361 (1st

Cir. 1932), revg. 21 B.T.A. 1245 (1931); *Foundation Co. v. Commissioner*, 14 T.C. 1333 (1950); *Fortson v. Commissioner*, 47 B.T.A. 158 (1942); *Hercules Motors Corp. v. Commissioner*, 40 B.T.A. 999 (1940); *Union Paving Co. v. Smyth*, 146 F. Supp. 147 (N.D. Cal. 1956).

In the other group of cases, the taxpayer quickly disposed of assets it had overbought for use in its business. *Mansfield Journal Co. v. Commissioner*, 31 T.C. 902 (1959), affd. 274 F.2d 284 (6th Cir. 1960); *Kanawha Valley Bank v. Commissioner*, 4 T.C. 252 (1944). *Kanawha Valley Bank* involved the purchase by the bank of Treasury bonds from the Government. In order to be assured that it would obtain the amount of Treasury bonds it desired to hold, the taxpayer found it necessary to overbid. Any excess bonds were immediately sold to other banks. We held that the gain on the sales was ordinary income. In *Mansfield Journal Co.* the taxpayer had a long-term contract to purchase newsprint. When the taxpayer discovered that it had contracted for too much newsprint, it disposed of the excess paper through an assignment of its contract rights, rather than a simple sale of the newsprint. We concluded that this was equivalent to a sale of goods rather than an assignment of a capital asset.

It is readily apparent that petitioner falls into neither class of cases. The currency it sold short was not part of its everyday flow of business income. Nor was petitioner's position similar to the Kanawha Valley Bank or the Mansfield Journal, both of whom purchased assets used in their respective businesses and then, when they discovered they had contracted for too much, kept what they needed and sought out customers to purchase the rest. Petitioner, on the other hand, incurred an obligation to sell something it did not have, did not manufacture, and which it had no contract right to receive. It did not hold something that it had to get rid of, as did the taxpayers in each of the cited cases. Instead, it needed a particular financial arrangement (a future sell contract) and went shopping for it. It was not in the position of a normal seller, who purchases or contracts to purchase, then solicits customers, or who stands ready to deal with all comers. Petitioner was, in fact, the bank's customer.

Petitioner has also relied on Rev. Rul. 78–281, 1978–30 I.R.B. 9, where the taxpayer, a U.S. corporation, operated an equipment rental business in country F. It borrowed money in that country to purchase a piece of equipment for rental to a customer there.

Shortly after the loan, country F devalued its currency, with the effect that it cost the corporation fewer American dollars to make each payment. The ruling holds that in such a situation the corporation will realize ordinary gain or loss equal to the difference on the date of each payment between the dollar value of that portion of the loan principal discharged and the dollar value of the F currency used to make the payment. In support of this conclusion, the ruling cites *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198 (1956), in which the taxpayer claimed capital gains on repayments of loans in foreign currency which had been incurred to finance the purchase of burlap abroad for import and sale in the United States. This Court held that although the loan and the purchase of the burlap were two separate transactions, and although the structure of the loan made the currency transactions similar to short sales, the loan was such an integral part of the taxpayer's regular business of importing and selling burlap that the gains derived were ordinary income.

Petitioner stresses the fact that the taxpayer in the revenue ruling had borrowed the money to purchase a piece of equipment rather than inventory. However, the key to the ruling is that the equipment the taxpayer was purchasing was also the product that it leased, just as the burlap was the product that America-Southeast Asia Co. sold. The financing transaction was incident to the taxpayer's business of leasing equipment—which generates ordinary income—and therefore the currency fluctuations gave rise to ordinary income or expense. In petitioner's situation, the foreign currency purchased was not incident to the business of petitioner that produced its ordinary income (i.e., the sale of appliances).

Moreover, the income and expenses incurred in relation to the rental of a piece of equipment are different in nature from the gains and losses in this case. Generally speaking, as petitioner emphasizes, equipment constitutes a depreciable asset, which is another way of saying that it is usually used up in time. In recognition of this, the Code allows for depreciation deductions over the useful life of the equipment. If the equipment is sold for less than its basis, the taxpayer gets an ordinary loss. Sec. 1231. If it is sold for more than its basis but less than its historic cost, the taxpayer has ordinary income. Sec. 1245. Only if the taxpayer sells it for more than its historic cost does he have any

capital gain, and even then he may have ordinary income. Secs. 1231 and 1245.

Stock, on the other hand, is not a depreciable asset. Its theoretical life is infinite. Increases and decreases in the fair market value of stock are only accounted for tax purposes when there is a recognizable event, usually a sale or exchange. Even then, they are capital gains or losses, except in exceptional circumstances not relevant here. See, e.g., sec. 1244. Thus, from a tax viewpoint, there is generally little similarity between a piece of equipment and a share of stock in a foreign corporation.

Since we do not view the currency purchased here as coming within the "primarily for sale" exception of section 1221(1), petitioner's desired analogy to the offsetting purchase contracts is also inapplicable.

Petitioner next contends that the requirement of "closure" (or sale and exchange) was not met in the certain instances in which it did not physically deliver the currency but entered into offsetting purchase agreements with the same party to the short sale and netted out the contracts. Petitioner asks us to ignore the existence of the purchase contract and to view the "netting" as equivalent to a release. This release, under petitioner's view, does not constitute a "sale or exchange" or "closure" under section 1233, and thereby results in ordinary gain or loss. Petitioner also relies on a letter ruling, issued April 8, 1974, by the Office of the Assistant Commissioner, Technical, Individual Income Tax Branch, in support of its theory that, if this was a release, it is entitled to ordinary gains or losses on the transactions herein.

This Court has expressed disfavor with any attempt by a taxpayer to restructure his transactions after he is challenged. In *Legg v. Commissioner*, 57 T.C. 164, 169 (1971), affd. 496 F.2d 1179 (9th Cir. 1974), we stated that:

> petitioners' first contention has little or no justification in light of the fact that the form of the transaction was contemplated and carried out by the petitioners; it was their decision to report the sale on the installment basis. *A taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form.* [Emphasis added.]

Moreover, we are not convinced that the substance of these transactions is truly different from its form. As we observed in *Acro Manufacturing Co. v. Commissioner*, 39 T.C. 377, 385

(1962), affd. 334 F.2d 40 (6th Cir. 1964), cert. denied 379 U.S. 887 (1964):

the taxpayer fashions the mold in which the transaction is cast. This is no case of substance versus form. We are dealing with substance alone, and the substance of the instant series of transactions is actually what was done. *That it could have been accomplished in another manner resulting in ordinary treatment is not persuasive that the same treatment should be accorded when a different plan is utilized.* [Emphasis added.]

Thus, we think it would be inappropriate to ignore the existence of 13 purchase contracts. Petitioner had the opportunity to structure its transactions in any manner it chose; and we will not now ignore the essential fact that petitioner viewed the purchase contracts as "offsets" and not mere releases.[7] These offsets clearly constitute both "closure" under section 1233 and a sufficient sale or exchange under the general capital provisions to mandate capital treatment here. Petitioner's occasional use of the term "compensate" is neither critical nor important in classifying these transactions. It is apparent to us that the term "compensate," far from indicating "release," indicates that any balance owed by or due to petitioner would be credited to or debited to its account. Moreover, it is undisputed that when the time for delivery on its sale obligations drew near, petitioner shopped around for the best possible purchase rate. This, we think, also manifested an intent to complete the transaction and not to be released from its obligations.

Finally, we note that the most common method of settling a forward sale contract has traditionally been to enter into a purchase contract and to offset the contractual obligations to sell and purchase. *Meade v. Commissioner*, T.C. Memo. 1973–46; *Muldrow v. Commissioner*, 38 T.C. 907, 910 (1962); *Sicanoff Vegetable Oil Corp. v. Commissioner*, 27 T.C. 1056, 1059, 1063 (1957), revd. 251 F.2d 764 (7th Cir. 1958). Offset of the contractual obligations by the seller has been held to be delivery under the sale contract (*Chicago Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 248 (1905); *Lyons Milling Co. v. Goffe &*

---

[7]Petitioner views a "release" as not being equivalent to a "closure" or "sale or exchange." Since we do not find a "release" here, we do not reach this issue. See *Commissioner v. Starr Brothers*, 204 F.2d 673 (2d Cir. 1953); *Commissioner v. Pittston Co.*, 252 F. 2d 344 (2d Cir. 1958), cert. denied 357 U.S. 919 (1958); *General Artists Corp. v. Commissioner*, 205 F.2d 360 (2d Cir. 1953), cert. denied 346 U.S. 866 (1953); *Leh v. Commissioner*, 260 F.2d 489 (9th Cir. 1958). Accordingly, petitioner's analogy to the letter ruling with respect to termination of an option other than by exercise or lapse is neither material nor relevant to this opinion.

*Carkener, Inc.*, 46 F.2d 241, 247 (10th Cir. 1931)), satisfying the sale or exchange requirement on the date the contract is settled. See *Covington v. Commissioner*, 42 B.T.A. 601 (1940), affd. in part 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942).

We hold with respect to the primary issue that the gains and losses realized by the petitioner constituted capital gains and losses. Accordingly, we must determine whether they were short-term or long-term gains and losses.

(1) *Sale of forward sale agreement with Chase (transaction 12).*—The sale of the contract results in long-term capital gain. The contract was entered into on May 5, 1969, and sold on December 31, 1969. The contract, a capital asset, was held for more than 6 months, the relevant long-term holding period. Sec. 1222. See *LaGrange v. Commissioner*, 26 T.C. 191 (1956); *International Flavor & Frangrances, Inc. v. Commissioner*, T.C. Memo. 1977–58. Respondent's contention that the sale was a sham was first raised on brief and we think it is without foundation. Since respondent admitted in his answer that the transfer was a "sale," and did not challenge that factual assumption during the trial, we find little merit in his contention that the sale was not, in reality, a sale.

(2) *Physical delivery of currency to close certain short sales (transactions 10, 16, 17, and 18).*—These transactions result in short-term capital losses. On contract No. 10, currency was purchased 2 days before delivery was due and such currency was delivered in satisfaction of the sale contract. On contract No. 16, currency purchased on January 20, 1970, was delivered on January 22, 1970. On contracts Nos. 17 and 18, currency purchased on January 20, 1970, was delivered on January 23, 1970, and January 30, 1970, respectively. Since the holding period of the currency was less than 6 months (secs. 1222 and 1223(8)), the loss on the sale was short-term. Section 1233(d), even if applicable, would not apply since the currency was not held for more than 6 months prior to the dates of the short sales.

(3) *Offsetting purchase contracts to close certain short sales (transactions 1 through 11, 13, 14, and 15).*—These transactions result in short-term capital losses, except for transaction No. 1, which results in short-term capital gain. With respect to transaction No. 1, the offset purchase contract was entered into within 6 months of the closing date. With respect to the remaining transactions, the offset purchase contracts were

entered into within 6 months of the closing date. Sec. 1223(8). Accordingly, short-term loss treatment is mandated.

To reflect issues settled by the parties and our conclusions on the disputed issues,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: The parties herein presented their positions in a narrow frame of reference and the disposition by the Court of Appeals of *International Flavors & Fragrances, Inc. v. Commissioner*, 524 F.2d 357 (2d Cir. 1975), revg. and remanding 62 T.C. 232 (1974), injected a further complication, particularly in light of the Government's abandonment on appeal of any reliance on *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). I am, therefore, in agreement with the majority decision and the rationale upon which it rests, insofar as this case is concerned.

However, I do not consider the majority opinion as precluding the application of *Corn Products Refining Co. v. Commissioner*, *supra*, or a variant of the principles articulated therein, in all situations involving foreign currency transactions by corporations having foreign operations. In the complex present-day world economy and the equally complex methods of doing business by multinational corporations, whether through subsidiaries or branches, there may be situations in which ordinary gain and/or loss treatment of such transactions would be justified.

DRENNEN, *J.*, agrees with this concurring opinion.

CHABOT, *J.*, dissenting: Neither party relies upon *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955); petitioner disclaims reliance upon that case and respondent asserts it is inapplicable. Since I believe that the general doctrine enunciated in *Corn Products* is applicable and that it should cause us to hold for petitioner, I respectfully dissent.

The Court should not allow itself to be boxed into deciding

particular issues of law in a case merely because the parties in that case want us to decide those issues. The question before us is not what the law would be in the absence of *Corn Products*, but what the law is, taking *Corn Products* into account. *Estate of Sanford v. Commissioner*, 308 U.S. 39, 51 (1939); *London-Butte Gold M. Co. v. Commissioner*, 116 F.2d 478, 479–480 (10th Cir. 1940); *Estate of Saia v. Commissioner*, 61 T.C. 515, 519–520 (1974); *Coates Trust v. Commissioner*, 55 T.C. 501, 511 (1970), affd. without discussion of this point 480 F.2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045 (1973); *Rosano v. Commissioner*, 46 T.C. 681, 687 n. 4 (1966); *A.B.C.D. Lands, Inc. v. Commissioner*, 41 T.C. 840, 849 n. 12 (1964); *Ohio Clover Leaf Dairy Co. v. Commissioner*, 8 B.T.A. 1249, 1256 (1927), affd. per curiam 34 F.2d 1022 (6th Cir. 1929), cert. denied 280 U.S. 588 (1929). See *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979); *Toner v. Commissioner*, 71 T.C. 772 (1979), and the various concurring and dissenting opinions therein.

Also, I am concerned that we not embark on the evolution of a court-made "one-way street." See sec. 1231. Compare our first decision in *International Flavors & Fragrances Inc. v. Commissioner*, 62 T.C. 232 (1974), revd. and remanded 524 F.2d 357 (2d Cir. 1975), supplemental opinion on remand T.C. Memo. 1977–58, with our decision in the instant case (see especially Judge Tannenwald's concurring opinion herein).

The Supreme Court's holding in *Corn Products* dealt with the definition of and tax treatment accorded to hedging transactions. I do not dispute the conclusion of the majority herein that the holding does not require a decision for petitioner in this case. However, *Corn Products* stands for more than its holding:

Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117(a). [Sec. 117 of the 1939 Code was the predecessor of subch. P of ch. 1 of the 1954 Code.] Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet v. Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of

those burdens on such conversions." *Burnet v. Harmel*, 287 U.S., at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See *Hort v. Commissioner*, 313 U.S. 28, 31; *Kieselbach v. Commissioner*, 317 U.S. 399, 403. [350 U.S. at 51–52.]

The transactions dealt with herein appear to have been entered into primarily for the purpose of protecting aspects of petitioner's trade or business and not as investments to provide revenue; they appear to conform to the general criteria as to nature and frequency laid down by the Supreme Court in *Corn Products Refining Co. v. Commissioner, supra* (certainly more so than the situation we dealt with in *International Flavors & Fragrances, Inc. v. Commissioner, supra*). I would hold that the transactions involved gave rise to ordinary income and ordinary loss, resulting in this case in a net ordinary loss.