T.C. Memo. 1997-292


UNITED STATES TAX COURT


EDWARD S. CULLIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12475-94.                    Filed June 26, 1997.


Edward S. Cullin, pro se.

<u>Lawrence B. Austin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined deficiencies, an addition to tax, and penalties with respect to petitioner's Federal income tax as follows:

| Year | Deficiency | Addition to Tax Sec. 6651 | Penalty Sec. 6662 |
|------|-----------|---------------------------|-------------------|
| 1989 | $27,650.70 | -- | $5,530.14 |
| 1990 | 17,324.00 | $4,331 | 3,445.00 |

All section references are to the Internal Revenue Code as in effect for the years in issue.

After concessions, the issues remaining for decision are: (1) Whether petitioner's losses from trading commodity futures are capital or ordinary; and (2) whether petitioner is liable for the accuracy-related penalties prescribed by section 6662(a) as determined by respondent for 1989 and 1990.

FINDINGS OF FACT

The parties have stipulated some of the facts. The stipulation of facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. Petitioner was a resident of Dunwoody, Georgia, at the time he filed his petition in this case.

During the years 1985 through 1990, petitioner was self-employed as a freelance writer and publisher. Prior to the years in issue, petitioner researched and wrote a manuscript entitled "The Wall Street Newspaper Daytrading Strategy". The manuscript describes a mechanical system for trading commodity futures which focused on the lead story on the Commodities Page of the Wall Street Journal. At the time the manuscript was written, there was only one lead story on the Commodities Page. The manuscript instructs a reader in how to execute a day trade with

respect to the commodity that is the subject of the lead story.  It provides mechanical rules for selecting the month and price of the commodity, and it describes how to offset the trade at the end of the day.  The manuscript also sets forth the results of hypothetical day trades using petitioner's system beginning on January 1, 1983, and ending on the date the manuscript was mailed to the customer.

Petitioner arranged for the manuscript to be typed, printed, and bound into book form.  Petitioner wrote and designed all of the advertising and promotional materials used to sell the manuscript.  He marketed the manuscript using a mail order approach.

Petitioner originally sold the manuscript under the name "The Wall Street Journal Daytrading Strategy".  However, he received a letter dated July 24, 1984, from Dow Jones & Co., Inc., stating that his use of the names Dow Jones & Co., the Wall Street Journal (WSJ), and Barron's, as well as the use of articles from, and the logo of, the WSJ in advertising his manuscript, was prohibited under the law.  After receiving the letter, petitioner changed the name of his manuscript to The Wall Street Newspaper Daytrading Strategy.

In order to sell his manuscript, which rendered advice on commodity futures trading, petitioner was

required to be registered as a commodity trading adviser (CTA). Petitioner applied for and, in 1986, obtained registration as a CTA with the Commodity Futures Trading Commission (CFTC). He also applied for and, in 1987, obtained registration as a CTA with the National Futures Association (NFA).

The NFA is an association responsible for regulating the professional conduct and financial responsibility of CTA's and others, including futures commissions merchants, introducing brokers, and commodity pool operators. As part of its regulatory activities the NFA conducts periodic audits of its members and monitors their advertising and sales practices.

Petitioner encountered two problems in 1988 with respect to his manuscript. First, on October 3, 1988, the WSJ changed the format of its Commodities Page by expanding it to two pages with two lead stories. Petitioner believed the new format would cause problems for his customers because his manuscript was premised upon evaluating only one lead article per day. Petitioner believed that readers of the manuscript would become confused as to which, if any, commodity they should trade on a particular day.

Second, on December 14, 1987, the NFA began a periodic audit of petitioner, and on May 13, 1988, it issued an audit report to petitioner. The audit report discussed

petitioner's advertisements appearing in the Atlanta Journal and in the October 1987 and November 1987 editions of Future Magazine. The report also discussed petitioner's tape recorded message to potential customers and his promotional material in general.

The NFA audit report found 30 alleged violations of CFTC regulations and NFA rules. Many of the deficiencies in petitioner's promotional materials and practices involved alleged violations of NFA rule 2-29, a rule designed to assure that potential investors in commodity futures receive accurate and verifiable information. The NFA had the authority to revoke petitioner's CTA license for violation of rule 2-29. In that event, petitioner could not legally continue to sell his manuscript to others. The NFA audit report did not require petitioner to trade commodity futures to document claims in his promotional material or to maintain his status as a CTA.

Petitioner began trading commodity futures in 1988. He traded through seven different accounts during the years in issue. The record does not state the number of trades that petitioner made in each year or the specific commodities he traded. The record also does not detail the profit or loss history of petitioner's various brokerage accounts. Petitioner sustained losses of $101,938.26 and

$54,529.65 trading commodity futures in 1989 and 1990, respectively.

Petitioner received the following gross receipts from the sale of his manuscript:

| Year | Gross Receipts |
|------|---------------|
| 1985 | $557.30 |
| 1986 | -- |
| 1987 | 2,162.00 |
| 1988 | 47,185.80 |
| 1989 | 138,681.46 |
| 1990 | 65,903.70 |

He reported the gross receipts for Federal income tax purposes on a Schedule C, Profit or Loss From Business, attached to his return for each of the above years.  For 1989 and 1990, petitioner's Schedules C report that he received the above gross receipts from a business by the name of "ED Cullin Commodity Trading Advisory" which was in the business of "Commodity Trading Advisor/Publishing".

The Schedules C for petitioner's publishing business for 1989 and 1990 also report deductions for "Research & Experimentation to Improve Trading System Formula for Sale" of $101,938.26 and $54,529.65, respectively.  These amounts are the losses that petitioner sustained trading commodity futures.

In the subject notice of deficiency, respondent disallowed the deduction of petitioner's commodity trading losses for 1989 and 1990.  The notice states as follows:

> It is determined that the amounts of
> $101,938.26 and $54,529.65 shown on Schedule C
> of your respective 1989 and 1990 income tax
> returns as research and experimentation to
> improve trading system formula for sale are
> not allowed because it has not been established
> that any amount was for an ordinary and necessary
> business expense.  Instead, the commodities
> futures transactions constitute capital assets
> and are includable as capital gains and losses on
> Schedule D.  Accordingly, your taxable income is
> increased $101,938.26 for 1989 and $54,529.65 for
> 1990.

Respondent allowed petitioner to treat the losses as short-term capital losses deductible on Schedule D, Capital Gains and Losses.  The notice states as follows:

> It is determined that you are entitled to short-
> term capital losses in the amounts of $102,158.00
> for 1989 and $54,530.00 for 1990, limited to
> $3,000.00 for each of the years 1989 and 1990,
> resulting from commodities futures transactions.

As a consequence of disallowing the deductions that petitioner claimed for his commodity trading losses, respondent also determined that petitioner is liable for additional self-employment taxes in 1989 and 1990, and respondent allowed petitioner a deduction in the amount of one-half of his self-employment tax liability in 1990.

## OPINION

The principal issue in this case is whether petitioner's losses from trading commodity futures are capital or ordinary.  Petitioner realized losses of

$101,938.26 in 1989 and losses of $54,529.65 in 1990. Petitioner treated the losses as ordinary and deducted them on a Schedule C, Profit or Loss from Business, filed with his return for each year. Each Schedule C identifies petitioner's business as "Commodity Trading Advisor/Publishing." The gross receipts reported on each Schedule C consist entirely of the receipts from the sale of petitioner's manuscript for his commodity trading system. Petitioner labeled the deductions as "Research and Experimentation to Improve Trading System Formula For Sale."

Respondent disallowed the deductions on the ground that petitioner had not established that the amounts were ordinary and necessary business expenses. Respondent determined that "the commodities futures transactions constitute capital assets and are includible as capital gains and losses on Schedule D." Respondent allowed petitioner to deduct the losses under section 165(a) but treated them as losses from sales or exchanges of capital assets which are allowable only to the extent allowed in sections 1211(b) and 1212. Accordingly, the principal issue for decision in this case is whether the losses realized by petitioner from his trading of commodity futures are losses from sales or exchanges of capital assets. In passing, we note that petitioner does not claim

that the amounts at issue are deductible as ordinary and necessary business expenses under section 162.

The term "capital assets" is defined by section 1221 as follows:

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include--
>
> (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
>
> (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
>
> (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by--
>
> (A) a taxpayer whose personal efforts created such property,
>
> (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or
>
> (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain

from a sale or exchange, in
whole or part by reference to
the basis of such property in
the hands of a taxpayer
described in subparagraph (A)
or (B);

(4) accounts or notes receivable
acquired in the ordinary course of
trade or business for services rendered
or from the sale of property described
in paragraph (1);

(5) a publication of the United
States Government (including the
Congressional Record) which is received
from the United States Government or
any agency thereof, other than by
purchase at the price at which it is
offered for sale to the public, and
which is held by--

(A) a taxpayer who so
received such publication, or

(B) a taxpayer in whose
hands the basis of such
publication is determined,
for purposes of determining
gain from a sale or exchange,
in whole or in part by
reference to the basis of
such publication in the hands
of a taxpayer described in
subparagraph (A).

According to the above definition, all property held

by a taxpayer, whether or not connected with his or her

trade or business, is included in the definition of capital

asset, except for the five categories enumerated in section

1221.  See generally Arkansas Best Corp. v. Commissioner,

485 U.S. 212 (1988).  Based upon the record of this case,

we have no basis to conclude that the commodity futures traded by petitioner during the years in issue fall within any of the five categories. First, petitioner does not claim that the commodity futures were stock in trade or inventory of his trade or business, the category described by section 1221(1). In this connection, we note that petitioner asserts that he was in the trade or business of "being self-employed, free lance writer/self-publisher" during the years in issue. Petitioner does not claim to have been in the business of trading commodity futures during 1989 and 1990. Second, commodity futures are not property "of a character which is subject to the allowance for depreciation", the category described by section 1221(2). Third, commodity futures are not "a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property", the category described by section 1221(3). Finally, petitioner does not contend that the commodity futures are "accounts or notes receivable", the category described by section 1221(4), nor does petitioner contend that they are "a publication of the United States Government", the category described by section 1221(5).

Notwithstanding the above, petitioner contends his losses from trading commodity futures are deductible as ordinary losses. Petitioner asserts that he opened the

commodity futures trading accounts "to hedge or solve" two problems that affected the manuscript he wrote describing a system for trading commodity futures and, thereby, to "insure and protect the copyright property's value and worth as an income producing property." According to petitioner, the manuscript is property described by section 1221(3) and is not included in the term "capital asset". Thus, according to petitioner, the losses he incurred trading commodity futures were incurred to "hedge" against the decrease in the value of the manuscript and "should receive ordinary treatment as well." As authority, petitioner cites Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955), and FNMA v. Commissioner, 100 T.C. 541 (1993).

There is no precise or ready definition of the term "hedging". Wool Distrib. Corp. v. Commissioner, 34 T.C. 323, 330 (1960). Generally, it is a label applied to certain futures transactions which, on all the facts and circumstances, have been found to be a form of price insurance and thus connected so closely with the regular conduct of a trade or business as to defy classification as extraneous investments. Id. at 330-331. Whether a transaction constitutes a hedge for Federal income tax purposes is a question of fact. FNMA v. Commissioner,

supra at 568; <u>Fulton Bag & Cotton Mills v. Commissioner</u>, 22 T.C. 1044, 1052 (1954).

In <u>Muldrow v. Commissioner</u>, 38 T.C. 907, 913 (1962), we stated that a hedge:

> is a form of insurance against unfavorable fluc-
> tuations in the price of a commodity in which a
> position has already become fixed or, as in the
> case of a producer such as a cotton grower, will
> become fixed in normal course and the sale,
> liquidation, or use of the commodity is to occur
> at some time in the future.

A bona fide hedge requires: (1) A risk of loss by changes in the price of something to be used or marketed in the taxpayer's business; (2) a possibility of shifting the risk to another person, through the purchase or sale of futures contracts; and (3) an attempt to shift the risk. <u>FNMA v. Commissioner</u>, <u>supra</u> at 569; <u>Muldrow v. Commissioner</u>, <u>supra</u> at 913.

In every hedge there must be a direct relationship between the product that is the basis of the taxpayer's business and the commodity futures in which the taxpayer deals for protection. E.g., <u>United States v. Rogers</u>, 286 F.2d 277, 281-282 (6th Cir. 1961). There must also be a close relationship between the price of the product and the price of the commodity future. E.g., <u>id.</u> at 282; <u>Hoover Co. v. Commissioner</u>, 72 T.C. 206, 231 (1979).

For example, in Wool Distrib. Corp. v. Commissioner, supra at 331, we discussed the relationship between the price of the product that is the basis of the taxpayer's business and the price of the commodity future as follows:

> A dealer with stocks of a particular commodity on hand runs the risk of loss should the market price of the commodity fall. To minimize that risk he will customarily enter a futures market and sell the same or a related commodity short in an amount equivalent to the amount in inventory. In this way he reaches an even or balanced position between actuals and futures, so that any loss resulting from a decline in the market price of the actuals will be offset pro tanto by the gains derived from closing out the futures at a commensurately lower cost. G.C.M. 17322, supra [1936-2 C.B. 151]. However, such a balancing of gain and loss will not be possible unless the market prices of the actuals and the futures are so related that they normally rise or fall together. If they do not, then the futures will increase rather than diminish the overall risk. For this reason hedging presupposes an intimate price relationship between the two. The actuals and futures need not be in the same commodity so long as their prices move in relation to each other. Albert Kurtin, 26 T.C. 958. Nor must the futures be in the exact amount of the actuals; the latter may be covered entirely or only to the extent protection is desired. Stewart Silk Corporation, 9 T.C. 174. But a larger amount of futures than of actuals or an absence of price relationship between the two will suggest that the futures were acquired as an investment and not as a hedge.

In this case, petitioner claims to have engaged in day trading of commodity futures as a hedge against the loss of value or income from his manuscript describing a system of

commodity futures trading. Both at trial and in his post-trial brief, petitioner attempted to establish a relationship between his commodity trading and his business of being a "free lance writer/self-publisher". As mentioned above, he argues that he was required to trade commodity futures in order "to hedge or solve" "two major copyright problems [that] happened in 1988." The first problem was the fact that the Wall Street Journal changed the format of its Commodities Page and expanded it to include two lead stories. This change threatened to make obsolete petitioner's "mechanical" system of trading commodity futures based upon one lead story, and, thereby, to make petitioner's manuscript valueless. The second problem was the fact that petitioner's promotional literature was audited by the NFA. According to petitioner, he traded commodity futures "to document the accuracy of any statements" he made in promotional material for his manuscript.

It is not necessary for us to address petitioner's argument that there was a direct relationship between his publishing business and the commodity futures that he traded. Even if we agreed that such a relationship existed, we must nevertheless sustain respondent because petitioner has failed to show any relationship between the price or value of his manuscript and the price of the

commodity futures that he traded.  See <u>United States v. Rogers</u>, <u>supra</u>; <u>Hoover Co. v. Commissioner</u>, <u>supra</u>; <u>Wool Distrib. Corp. v. Commissioner</u>, 34 T.C. 323 (1960). Indeed, petitioner has not even identified the specific commodities that were the subject of his day trades.  We perceive no necessary relationship between the price of petitioner's manuscript and the price of the commodities that petitioner traded such as to qualify as a hedge. Thus, we reject petitioner's argument that the commodity futures that he traded during the years in issue were hedges against the loss in value of his manuscript. Accordingly, we reject petitioner's argument that his losses from trading commodity futures during 1989 and 1990 are deductible as ordinary losses.

Before leaving this issue, we note that petitioner labeled the deduction of his trading losses in each of the years in issue as "Research & Experimentation to Improve Trading System Formula for Sale".  We also note that the petition states that the losses are deductible under section 1.174-1, Income Tax Regs., as "research & development expenses".  However, in his post-trial brief, petitioner does not claim that the subject losses are deductible as research and experimental expenditures under section 174.  Thus, petitioner has abandoned this argument. <u>Money v. Commissioner</u>, 89 T.C. 46, 48 (1987); <u>Alexander v.</u>

Commissioner, 61 T.C. 278, 288 n.6 (1973); Bernstein v. Commissioner, 22 T.C. 1146, 1152 (1954), affd. 230 F.2d 603 (2d Cir. 1956). Moreover, the record of this case suggests that petitioner incurred the subject losses in connection with his manuscript, presumably a "literary" work. See Quinn v. Commissioner, T.C. Memo. 1974-64; cf. Crouch v. Commissioner, T.C. Memo. 1990-309. The phrase "research or experimental expenditures", however, does not include expenditures for "Research in connection with literary * * * projects." Sec. 1.174-2(a)(3), Income Tax Regs.

The next issue for decision involves respondent's determination that petitioner is liable for the accuracy-related penalty imposed by section 6662(a). Respondent determined that the entire underpayment for 1989, $27,650.70, and a portion of the underpayment for 1990, $17,224, is attributable to negligence or disregard of rules or regulations. See sec. 6662(a) and (b)(1). The term "negligence" includes any failure to make a reasonable attempt to comply with the statute, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Respondent's determinations are presumed correct, and petitioner bears the burden of proving that he is not liable for the accuracy-related penalty. Rule 142(a). All Rule

references are to the Tax Court Rules of Practice and Procedure.

Section 6664(c) provides that no penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The determination of whether this exception applies is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. An honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer, can support a finding that the taxpayer had reasonable cause and was in good faith. Id. Generally, however, the most important factor in determining whether this exception applies is the extent of the taxpayer's efforts to assess the taxpayer's proper tax liability. Id.

Petitioner contends that he relied on "substantial authority" and provided "adequate disclosure" of his deductions within the meaning of the statute and, therefore, should be absolved from the penalty. Petitioner also argues that he and respondent merely have an "honest difference of opinion" with respect to the law and that he should be absolved from the penalty on this basis. We

construe petitioner's latter argument as invoking section 6664(c), the reasonable cause exception to the accuracy-related penalty.

Based upon the facts and circumstances of this case, we find that petitioner has failed to meet his burden of proving that he is not liable for the accuracy-related penalty.  On the subject returns, petitioner labeled the deduction of his commodity trading losses as "Research & Experimentation to Improve Trading System Formula for Sale".  That label suggests that petitioner claimed the amounts as research or experimental expenditures under section 174.  Neither of petitioner's returns discloses the fact that the subject amounts are losses from trading commodity futures.  Significantly, as mentioned above, petitioner did not pursue the claim that the subject amounts are research or experimental expenditures in his post-trial brief.  Moreover, we know of no authority permitting losses from the sale or exchange of capital assets to be treated as ordinary in these circumstances. Finally, we are not convinced that the underpayment was the result of an honest misunderstanding of fact or law that is reasonable in light of the facts and circumstances of this case.

Accordingly, we sustain respondent's determination of the accuracy-related penalty.

<u>Decision will be entered</u>

<u>under Rule 155</u>.